OPINION OF THE COURT
George L. Jurow, J.
Petitioner, an authorized child care agency, brought this proceeding seeking an order pursuant to Social Services Law § 384-b terminating the parental rights of the respondent mother Patricia L. to her four children, and transferring custody and guardianship to the petitioner, on the grounds that respondent cannot provide adequate care for the children *82 because of her mental retardation,[1] or alternatively, that respondent has permanently neglected her children.
This proceeding raises the important question, addressed only rarely before in this State, of what obligation, if any, a petitioner child care agency has under the provisions of Social Services Law § 384-b to provide remedial (or therapeutic) supportive services geared towards the special needs of a respondent diagnosed as "mildly mentally retarded”, in the context of a proceeding to terminate that parent’s rights. The answer to this question, at least in terms of the petitioner agency’s conduct in the instant case, may have significant implications for the way child care agencies address the needs of mentally retarded parents.
I
To terminate parental rights on the basis of mental retardation, the petitioner must meet the statutory requirement of showing that the parent "presently and for the foreseeable future [is] unable, by reason of * * * mental retardation, to provide proper and adequate care for a child” (Social Services Law § 384-b [4] [c]). The statute further defines mental retardation as "subaverage intellectual functioning which originates during the developmental period and is associated with impairment in adaptive behavior to such an extent that if such child were placed in or returned to the custody of the parent, the child would be in danger of becoming a neglected child as defined in the family court act”. (Social Services Law § 384-b [6] [b].)
It should be noted that Social Services Law § 384-b (4) (c) has been held to be constitutional against challenge that it infringes on the rights of the mentally retarded since it is not the status of retardation itself that is the basis for the termination, but rather manifestation of the disability in terms of maladaptive behavior to the degree that the child is or would be in danger of neglect. (See, Matter of Joyce T., 65 NY2d 39.)
To terminate a parent’s rights on the basis of permanent neglect, the petitioner must meet the statutory requirement of showing that the parent "has failed for a period of more than *83 one year following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency’s diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the best interests of the child”. (Social Services Law § 384-b [7] [a].)
Whether based on mental retardation, or on permanent neglect, the statute requires that any termination order must be based on clear and convincing proof. (Social Services Law § 384-b [3] [g].)
II
The respondent mother, Patricia L., age 40, has four children, currently ranging in age between 2 and 11 years. For many years, Mrs. L. was married to and lived with Clyde L., who fathered the three oldest children. Mr. L. died in 1982. After her husband’s death Mrs. L. lived with Walter E., who is the father of her youngest child. Mr. E., who became progressively ill during the last several years of his life, died in 1984. The three oldest children were voluntarily placed with the Commissioner of Social Services in October 1983 by the respondent who then, following the death of her husband, could not adequately provide for their care. The youngest child was also voluntarily placed with the Commissioner of Social Services in January 1984. Through the Commissioner, the children came into the care of the petitioner agency. The instant petition to terminate respondent’s parental rights was filed in March 1985.
Four witnesses testified at the trial, including a court-appointed psychiatrist and psychologist (who conducted the examinations mandated by Social Services Law § 384-b [6] [e]); the petitioner agency caseworker; and a social worker for the childrens’ Law Guardian (who limited her testimony to the fact that several of the children wished to return home to the respondent). On consent of all parties, the agency case record was introduced in evidence, with appropriate redactions stipulated to by the parties.
The psychologist testified that her examination determined that the respondent has an IQ of 57, which placed respondent in the "mild” or least severe of the four categories of retarda *84 tion.[2] She further testified, that the respondent would have difficulty making day-to-day basic caretaking decisions, both for herself and the children.
The psychiatrist testified that, in functional terms, the respondent had limited cooking ability; had difficulty in traveling; could not manage money, could not readily purchase in stores; did not have the judgment to manage medical emergencies; and in general, could not provide adequate structure and supervision for her children. However, the respondent had "some minimal coping skills” and appeared to have a significant emotional attachment to her children. The psychiatrist further testified that in order for the children to remain in the custody of the respondent a full-time homemaker would be required. However, in his testimony (and in his written report) the psychiatrist acknowledged that his assessment as to the respondent’s capacities to function more adequately and independently must be qualified and was limited by the fact that the only time he observed respondent was during the single half-hour psychiatric interview; the psychiatrist stated that his assessment needed to be supplemented by social work or other collateral sources who had more interaction with the respondent and her children.
The agency caseworker testified to the efforts the agency made to assist the respondent during the period from 1983, when the children first came into foster care, to the date the instant petition was filed in 1985. She testified that the agency assisted the respondent in managing her money, in obtaining housing and in visiting her children.
III
Petitioner’s cause of action based on permanent neglect centers on the question of whether the agency met the statutory requirement of making "diligent efforts” to encourage and strengthen the parental relationship. The nature of the "diligent efforts” mandate was reviewed by the Court of Appeals in considerable detail in Matter of Sheila G. (61 NY2d 368). In Sheila G, the court held that the diligent efforts requirement is a condition precedent that the agency must both affirmatively plead in detail, as well as prove at trial, before the court may even consider whether the parent has *85 met his or her duty to maintain contact with and plan for the future of the child. In reaching this result, the court reviewed the legislative history establishing the statutory duty of diligent efforts, and underscored the policy reasons for the requirement in the following language:
"[T]o enable a child to return to his or her family, an agency must have 'the capability to diagnose the problems of the parent and of the child; access to a host of concrete supportive and rehabilitative services; cooperation with community treatment programs (such as health, alcohol, and drug treatment); and a casework staff that can motivate the parents to avail themselves of services’ * * * [l]ower courts have recognized that an agency is in a superior position to the parent with respect to the planning factor. 'The parties are by no means dealing on an equal basis. The parent is by definition saddled with problems: economic, physical, sociological, psychiatric, or any combination thereof. The agency, in contrast, is vested with expertise, experience, capital, manpower and prestige. Agency efforts correlative to their superiority [are] obligatory’ * * *
"The corollary to the agency’s dominant position is that indifference by the agency may greatly serve to impede a parent’s attempts at reunification * * *
"Of course, transcending the practical reasons for providing a threshold requirement that an agency exercise diligent efforts toward reuniting parent and child is the strong public policy that before the State may terminate parents’ rights it must first attempt to strengthen familial ties * * * 'retention of the diligent effort requirement reflects] a sound societal value in addition to considerations of fundamental equity, if not constitutional rights, that the State should exercise reasonable efforts to restore familial relationships before seeking to terminate them’ ”. (61 NY2d, at pp 381-383.)
The record indicates that the petitioner agency made some efforts to assist the respondent with her housing and financial affairs, and in arranging visitation. However, what the agency did not do, in this court’s view, was more critical. What the agency failed to do was to provide or attempt to provide for the respondent, in any meaningful way, during the 17-month period her children were in the care of the petitioner agency, either general psychiatric or psychological services, or specialized mental retardation services. The need for these types of remedial services, based on this record, was compelling for the following reasons:
*86 As noted, the children came into foster care after the death of the respondent’s husband. For most of the time the children have been in foster care, the respondent’s adult living companion, who not only provided the respondent with needed support but who was also the father of her youngest child, was seriously if not terminally ill and died in the year prior to the filing of the petition. Even a lay individual, familiar only with these basic facts, would expect that a respondent under these circumstances would suffer some degree of emotional difficulty and in all likelihood would be in a position to benefit from if not require psychiatric or psychological assistance. In fact, the case record in evidence indicates that during most of the period of foster care, the respondent mother was generally despondent and at times significantly depressed. The caseworker, in her redirect testimony, characterized the respondent, after the death of her paramour in 1985, as "grief stricken”. In addition, the court-ordered psychiatric examination indicated that the respondent, although not severely mentally ill to the degree constituting a basis for termination of parental rights on the ground of mental illness itself, suffered from a so-called "family circumstance problem”, that is, emotional symptomatology stemming from the respondent’s situational condition of distress arising from the deaths in her family and the loss of her children into foster care.
"Diligent efforts”, in terms of both common sense as well as statutory meaning, includes the provision of psychiatric and psychological assistance, where such assistance is obviously warranted. (See, Social Services Law § 384-b [7] [f] [3]; Carrieri, Practice Commentary, McKinney’s Cons Laws of NY, Book 52A, Social Services Law § 384-b, p 127; Matter of Sheila G., supra.) Psychiatric or psychological assistance was obviously, if not desperately, needed by the respondent during the three-year period prior to the filing of the petition, to help her cope with her emotional distress following the multiple deaths in her family and loss of her children to foster care. Yet, the agency never ever offered, let alone provided, to the respondent any of these psychiatric or psychological services.
Even more inexplicable than the failure of the agency to provide respondent with needed psychiatric or psychological services was the failure to provide any services designed specifically to address the respondent’s primary disability of mental retardation. Whether the agency should be charged with an obligation to provide such services depends upon whether the agency knew or should have known of the respon *87 dent’s specialized disability; the respondent’s demonstrable need for such services; and whether or not such specialized services are reasonably available in the community. These questions must be answered in the affirmative. That the agency should be charged with knowledge of the respondent’s specialized disability of retardation, and her need for services designed to deal with this disability, is underscored by a review of the limited and regretably abortive attempts the agency did make to address this problem.
It is undisputed that the agency itself had the respondent psychologically tested a year prior to the filing of this petition, which testing revealed the respondent to have an IQ score diagnostic of "mild mental retardation” (a finding similar to that contained in the later court-ordered psychological examination). The case record in evidence indicates that in August 1984, 10 months after the respondent’s children came into care, the agency for the first time noted that the respondent should be referred to "some sort of training program for the mentally retarded”. This referral to the recipient agency was never effectuated, through no fault of the respondent, but rather due to agency failures. The case record indicates that in November 1984 the referral had not occurred because of a "back log” at the recipient agency. Not until November 5, 1984 (four months prior to the filing of the instant termination petition) was a caseworker assigned to and an appointment set up for the respondent at the recipient agency. Contact was finally made between the recipient agency caseworker and the respondent on November 13, 1984, at which time the caseworker indicated that the respondent needed to be evaluated in terms of her "long-term capabilities as far as dealing with daily living skills and her ability to function effectively as a mother of 4 young children”. One month later the petitioner agency was notified that the Department of Social Services approved the petitioner agency’s request to change the "permanency plan” for the L. children to adoption. Subsequently, as indicated in the case record, the respondent never received any training services at the recipient agency because the recipient agency caseworker failed to keep scheduled appointments, not only with the respondent, but also with the petitioner agency who made the referral.[3]
In sum, this court holds that, on the basis of this record, the *88 failure of the petitioner agency to provide specialized mental retardation services related to a respondent diagnosed as having the functional disability of "mild mental retardation” constitutes a failure to make diligent efforts within the meaning of Social Services Law § 384-b (7) (a).[4] In addition, this court also holds that, on the basis of this record, the failure of the petitioner agency to provide psychiatric or psychological services for a respondent suffering from depression and other emotional trauma also constitutes a failure to make diligent efforts within the meaning of Social Services Law § 384-b (7) (a). Taken together, the failure of the petitioner agency to provide both specialized mental retardation services and psychiatric or psychological services to a respondent diagnosed as mildly mentally retarded, who also suffered from depression during the 17-month period the respondent’s children were in the care and custody of petitioner agency, constitutes a failure to make diligent efforts within the meaning of Social Services Law § 384-b (7) (a).
Even if this court were to find that the petitioner had met its threshold burden of proving "diligent efforts”, which this court does not so find, the court would still find that petitioner had not met its burden of proving permanent neglect. Not only did petitioner fail to show diligent efforts, but petitioner also did not show that respondent had "substantially and continuously or repeatedly [failed] to maintain contact with or plan for the future of the child” (Social Services Law § 384-b [7] [a]). Little or no evidence was adduced by petitioner related to the question of failure to plan. With respect to the issue of maintaining contact, petitioner caseworker addressed much of her testimony in support of an argument that respondent’s visits with her children, which petitioner conceded took place *89 regularly, were insubstantial within the meaning of Social Services Law § 384-b (7) (b).[5] Essentially, petitioner contended that respondent’s visits, although regular and continuous, were characterized by "passive” behavior on her part in that the agency caseworker had to "prompt” the respondent, on many occasions, to interact with her children. The case record in evidence contradicts this testimony. The entries in the case record indicate that, except for a small percentage of the visits, the large proportion of respondent’s visits were satisfactory in exhibiting both effective interaction with, and affection toward, the children on the part of the respondent. The record simply does not support petitioner’s claim that the respondent did not substantially and continuously maintain contact with her children.
IV
Having found that petitioner has failed to establish its first cause of action based on permanent neglect, the court now turns to petitioner’s second cause of action based on mental retardation.
Petitioner’s claim that respondent’s rights should be terminated because of mental retardation, on the basis of this record, raises two interesting issues. The first is whether the statute providing for termination on the basis of mental retardation requires, as a condition precedent, that the agency establish — as it must with respect to permanent neglect— diligent efforts. The second issue is whether, if diligent efforts are not required for a claim grounded in mental retardation, petitioner has proven that the respondent presently and for the foreseeable future is unable to provide satisfactory care for her children. These two issues are of particular interest because of the paucity of reported termination decisions based on claims of mental retardation.
If diligent efforts are required under Social Services Law § 384-b (4) (c), the mental retardation termination provision, then petitioner’s claim must fail because, as the court has already analyzed, and for the same reasons, petitioner has failed to establish diligent efforts with respect to this mentally retarded respondent. However, Social Services Law § 384-b (4) (c), as quoted above, does not, unlike the statutory provision *90 defining permanent neglect, contain any explicit reference to a diligent efforts requirement.
The one Family Court decision that has specifically addressed this issue held that the diligent efforts requirement is applicable to termination proceedings based upon mental retardation.
In Matter of Viana Children (124 Misc 2d 543) the Nassau County Family Court, relying almost entirely upon Matter of Sheila G. (supra), held the latter decision, which was a proceeding based upon permanent neglect, applicable to mental retardation proceedings as well. The court reasoned that the policies furthered by the diligent efforts requirement are important and no different, regardless of whether the petition is grounded in permanent neglect or mental retardation, asserting that "parents suffering from mental retardation or mental illness require more skill, tolerance, understanding and compassion by the agency than the average parent” (124 Misc 2d, at p 544). This court finds the decision in Viana misplaced and respectfully disagrees with its holding that diligent efforts applies to termination proceedings based upon mental retardation.
The flaw in the Viana holding (supra) is that Social Services Law § 384-b (4) (c), defining termination based upon mental retardation, does not contain a diligent efforts requirement, whereas Social Services Law § 384-b (7), defining termination based upon permanent neglect, specifically incorporates a diligent efforts requirement. The Viana decision simply bypassed the critical question of the propriety of the court incorporating a diligent efforts mandate in a statute devoid of such language. Although Viana states a cogent reason why it may make sense to require diligent efforts in a termination proceeding based upon mental retardation, that is not sufficient to permit a court to read such a requirement into a statute that otherwise omits the provision. The more correct view was articulated in Matter of Everett S (62 AD2d 1069), in which the Third Department refused to incorporate a diligent efforts requirement in the mental retardation statute, citing Matter of Anonymous (St. Christopher’s Home) (40 NY2d 96). In Anonymous, the Court of Appeals refused to incorporate a diligent efforts requirement into the statute relating to termination based upon the ground of abandonment, since the statutory definition of abandonment was otherwise devoid of *91 such language.[6] After noting that the various statutes providing grounds for terminating parental rights are "separate and distinct means of terminating parental rights * * * drafted to meet a particular situation” (pp 102-103), Anonymous, citing Matter of Malpica-Orsini (36 NY2d 568), held that "[i]f due diligence is to be a requirement of section 384, that is a matter for the Legislature, the courts having no right to expand statutory terms”. (Supra, at p 102.) Accordingly, this court holds that petitioner, in its cause of action based on mental retardation, need not prove a diligent efforts predicate.
Although petitioner need not show diligent efforts, its cause of action based on mental retardation nonetheless requires proof that respondent, because of mental retardation, is presently and for the foreseeable future unable to care for her children. (Social Services Law § 384-b [4] [c].)
The credible evidence contained in this record has previously been reviewed by the court (see, section II, supra). The court finds that the petitioner has adequately met its burden of showing that the respondent is presently, by virtue of mental retardation, unable to provide satisfactory care for her children. However, for the reasons noted below, the court finds that the petitioner has failed to demonstrate, by the applicable standard of clear and convincing evidence, that the respondent is unable for the foreseeable future to provide satisfactory care:
In requiring petitioner to establish that respondent is presently and for the foreseeable future unable to care for her children, Social Services Law § 384-b (4) (c) establishes a two-pronged test since the elements of present condition and foreseeable condition are conjunctive. Although in many if not most cases a respondent who is mentally retarded will be unable to care for her children both in the present as well as in the future, it does not follow that in all cases a demonstration of present incapacity ipso facto demonstrates future incapacity.
Current professional expertise and convention recognizes four levels or degrees of mental retardation, ranging in terms *92 of ascending severity from mild to profound.[7] The expert testimony placed this respondent in the mild, or least severe, level of retardation. Because the so-called "mild” category involves the overwhelmingly largest percentage of individuals diagnosed as mentally retarded, it logically follows and is also professionally accepted that there can be considerable if not widespread differences in the level of adaptive functioning of individuals diagnosed as falling within the category of the mildly retarded. Because of the potential for variation in adaptive functioning,[8] a petitioner who contends, as in this case, that a mildly retarded parent will be unable to function as a parent in the foreseeable future, must do more than rely solely on present incapacity. The demonstrated present incapacity of a mildly retarded parent, without more, is not enough to establish future incapacity within the meaning of Social Services Law § 384-b (4) (c), as this record singularly demonstrates.
Ordinarily, the inference of future incapacity is drawn from a combination of factors, including an extensive prior history of incapacity; the severity of present incapacity; and the failure of remedial efforts to make any difference in adaptive functioning. What distinguishes this record is the fact that it is virtually devoid of evidence concerning a lengthy history of prior maladaptive parental functioning, as well as evidence concerning the effects of remedial efforts, evidence usually associated with a record meeting the statutory requirement. Petitioner has offered no evidence whatsoever concerning the respondent’s parental functioning prior to 1984, when her children first came into care. In fact, if anything, the record suggests that prior to 1984 the respondent may have functioned adequately, albeit marginally, as a parent.[9] (Compare, *93 Matter of Iris C., 82 AD2d 857 [17-year history of hospitalization in numerous State psychiatric facilities; persistent course of deterioration].) In addition, petitioner, having provided no remedial services oriented towards respondent’s disability, was unable to demonstrate that respondent has failed to sufficiently benefit from such efforts, a demonstration that would allow the court to more readily draw an inference as to future incapacity. (Compare, Matter of Joyce T., 65 NY2d 39, 43, supra ["despite 'tremendous assistance’ from the community and the State in becoming independent and developing child-rearing capacities, appellants continued to suffer from an 'impairment of an adaptive behavior’ ”].) The inference as to future incapacity is all the more difficult to draw in this case because, as previously noted, the respondent’s children came into petitioner’s care and remained in such care during a relatively brief interval during which respondent suffered two grievous losses, namely, the deaths of her husband and her paramour. Under such circumstances, it would appear that petitioner was under a more than ordinary obligation to provide remedial services, not merely for the self-evident reason that such services were expected if not compelled as a matter of appropriate social service practice, but also because it would demonstrate that the traumas the respondent suffered would have more than transient effects. Yet, as noted, petitioner failed to provide remedial services designed to ameliorate respondent’s emotional problems related to the deaths in her family, or services related to her disability of mental retardation.
In concluding that petitioner has failed to meet its burden of proving the respondent’s future incapacity, this court is cognizant of the fact that petitioner is not required, as a matter of law, to rule out each and every possibility that respondent may in the future regain adequate parental capacity. Such a standard would frustrate and render meaningless any reasonable termination statute. In other words, this decision is not based on what one dissenting opinion decried as a "vague possibility of unprecedented recovery in the unforeseeable future”. (Matter of Hime Y., 52 NY2d 242, 252.) Rather, the petitioner has failed to take obvious measures to assist the respondent to function in the present, measures that would *94 allow the court a basis to make a feasible inference as to future capacity.[10]
The court is in no way suggesting that had the petitioner agency provided remedial (therapeutic) services for the respondent, that such services would later enable respondent to effectively parent. The outcome of any such efforts would have to be viewed as problematic at best since respondent’s current disability, though falling in the "mild” category of retardation, still reflects a serious impairment in adaptive functioning. What the court is saying is that respondent’s disability is not so severe as to render remedial efforts inherently fruitless. Had petitioner acted to provide such services in a timely manner soon after the L. children came into foster care this would have allowed there to be relatively early closure on the ultimate question of whether the children could be returned to the parent or should be freed for adoption, such timely closure meeting the Legislature’s goal of providing children with permanency and stability. (See, Social Services Law § 384-b [1].)
Finally, it is important for the court to make clear that, in noting the significance of petitioner’s failure to provide remedial services related to the respondent’s disability of mental retardation, the court is not by indirection reading into Social Services Law § 384-b (4) (c) a diligent efforts requirement. There is a distinction between a specific statutory predicate of diligent efforts, in contrast to a more general requirement of parental incapacity in the foreseeable future. The latter standard, being general in scope, may, depending on the circumstances of the particular case, encompass a diligent efforts mandate. In this particular case, the failure of petitioner to make diligent efforts in providing respondent with remedial mental retardation and related services is critical, not because Social Services Law § 384-b (4) (c) contains a diligent efforts mandate (as indicated, there is no such statutory mandate), but because the failure to provide diligent efforts or in fact any remedial efforts [11] is relevant in making it difficult if not *95 impossible to assess the foreseeable future parental capacity of the respondent. It could thus be said that the question of diligent efforts is but one issue that is subsumed within the more general mandate in Social Services Law § 384-b (4) (c) to demonstrate, in the case of mental retardation or mental illness, what the respondent’s adaptation will be in the "foreseeable future”.
Although the result may be the same under the fact pattern presented in the instant case, whether or not the statute contains a diligent efforts predicate, in other fact patterns involving mental illness or mental retardation, a diligent efforts mandate may be less essential or perhaps even irrelevant. For example, fact patterns involving severe or profound mental retardation (IQ level below 34) may offer little or no realistic hope of adequate parental functioning.[12] However, instead of subsuming the diligent efforts issue within the general question of "foreseeability”, as is now the statutory scheme, were the Legislature to amend Social Services Law § 384-b (4) (c) to incorporate a qualified diligent efforts requirement (qualified, perhaps, "as necessary” or "if indicated”), this more explicit language would have the beneficial effect of putting agencies on notice that such efforts in some cases, such as the instant matter, may be important if not crucial in meeting petitioner’s burden in a termination proceeding, without subjecting agencies to the mandate under circumstances where it would be obviously futile.
Whether or not the statute is amended, what this case does highlight, beyond the statutory technicalities, is that in this "post-Willowbrook” era, social service agencies need to be more sensitive to the specialized needs of mentally retarded parents whose children come into their care, particularly when these agencies attempt to terminate the parental rights of those parents.
The petition is dismissed in its entirety.

. Petitioner also alleged mental illness as a basis for termination (see, Social Services Law § 384-b [4] [c]), but conceded at trial that there was no proof to sustain this allegation.

. The categories include mild (IQ 50-70); moderate (IQ 35-49); severe (IQ 20-34); and profound (IQ below 20). (See, Diagnostic and Statistical Manual, American Psychiatric Assn [DSM III], at 39.)

. Given this history, the respondent’s resultant anger at the agency caseworkers is more than understandable.

. Subsequent to the historic "Willowbrook” case (see, New York State Assn. for Retarded Children v Carey, 393 F Supp 715 [US Dist Ct, EDNY 1975]), protection of the rights of the mentally retarded including recognition of their treatment and training needs has become an accepted tenet among providers of social and mental hygiene services. Therefore, it would not appear to be too great a burden to charge petitioner, an authorized social service agency, with the task of recognizing the need for and assuring the provision of services targeted to their clients diagnosed as mentally retarded. Services for the particular assessment, educational, training and treatment needs of the mentally retarded are now widely, if not optimally, available in the New York City area. (See, 1984-1987 State Plan, Office of Mental Retardation and Developmental Disabilities, State of New York; 1986 Local Government Plan, New York City Dept of Mental Health, Mental Retardation and Alcoholism Services.)

. "A visit or communication by a parent with the child which is of such character as to overtly demonstrate a lack of affectionate and concerned parenthood shall not be deemed a substantial contact”.

. Applying a diligent efforts requirement in abandonment cases would appear illogical and therefore unnecessary since the respondent cannot be physically located. (See, Barriers to the Freeing of Children for Adoption, Final Report of Temp State Commn on Child Welfare [1976].) This distinction is obviously less applicable in the case of a mentally retarded respondent who is ordinarily available and in a position to receive services from the petitioner agency.

. See, note 2 (supra).

. See, DSM III (op cit, at 36-40).
"Mental retardation is simply descriptive of current behavior and does not tend to imply the ultimate outcome of the individual.
"The ultimate outcome is far more related to such factors as these other conditions — motivation, treatment, and training opportunities * * *
"The prognosis or prediction of ultimate outcome depends on * * * other factors * * * associated conditions, and what one does about them” (1 Mental Disability L Rptr 298, 300 [1977], quoting from the transcript of the testimony of an expert witness in the Willowbrook case, New York State Assn. for Retarded Children v Carey, supra; emphasis added).

. As the psychiatric report used by the psychiatrist to assist his recollection during his testimony stated, "it appears that the respondent took over her deceased husband’s job as superintendent of the building in which she *93 lived, subsequent to his death. She talks about having had to wash walls, shovel snow and put out the garbage. This eventually became too much for her and she stopped”.

. Even the dissent in Matter of Hime Y. (52 NY2d 242, 251) referred to the provision of services in that case by noting the respondent’s "longstanding and persistent mental disorder which has proven resistant to successful treatment in the past”.

. Superordinate efforts are not required by the agency. (See, Matter of Joyce T., 65 NY2d 39, 43, 47, indicating that full-time resident help, such as that including a 24-hour homemaker, is not required as a permanent plan since this would constitute the auxiliary homemakers as "surrogate par *95 ents”; see also, Matter of Tonya Louise M., 91 AD2d 868.) Although the psychiatrist testified in the instant matter that respondent required a 24-hour homemaker, this service appeared to relate to the respondent’s present needs, there being no articulation by the witness as to her future or permanent needs. Most important, petitioner in the instant matter, although not required to provide the extensive remedial services referred to in Joyce T. and Tonya Louise M., provided no remedial services at all.

. See, DSM III (op cit., at 39-40).