780 P.2d 407

**In the Matter of the Appeal in PIMA COUNTY SEVERANCE ACTION NO. S–2397.**

**Nos. 2 CA–JV 88–0036, 2 CA–JV 88–0037.**

Court of Appeals of Arizona, Division 2, Department A.

June 21, 1989.

Review Denied Oct. 24, 1989.*

* Gordon, C.J., of the Supreme Court, was not present and did not participate in the determination of this matter.

Peter W. Hochuli, Tucson, for natural mother.

Edith A. Croxen, Tucson, for minors.

Robert K. Corbin, Atty. Gen. by Laurie S. Beaver, Tucson, for the State.

## OPINION

PER CURIAM.

The natural mother of three minor female children, born June 20, 1980, December 25, 1983, and June 18, 1987, appeals the juvenile court's order terminating her parental rights as to the two older children. The Arizona Department of Economic Security (DES) also appeals from this order in connection with the denial of its petition to terminate the natural mother's parental rights as to the youngest child. We affirm the severance of the mother's rights as to her first two children and reverse the trial court's order as to the youngest child.

## FACTS

The mother was involuntarily committed to Kino Hospital on April 20, 1985, immediately following an incident during which she threatened the lives of her children and her sister. The incident was preceded by a history of neglect and possible physical abuse of the children, suicide threats, and threats to take the lives of her children and her own mother. The mother's in-patient treatment at Kino Hospital was followed by one year of out-patient treatment, during which time she was prescribed psychotropic medication. Two psychiatrists from the hospital diagnosed the mother as suffering from chronic undifferentiated schizophrenia, mild mental retardation, and a dependent personality disorder. In October 1985 her two minor daughters were declared dependent. After more than 18 months in foster care, the two minor daughters were placed with the mother's sister in California. Evidence was presented at the severance hearing that these two children showed signs of both neglect and physical and emotional abuse and that they were developmentally behind, both intellectually and emotionally, but improving significantly after placement with the maternal aunt. Psychologist Guillermo Gallegos, who evaluated the mother in October 1985 and testified at the severance hearing, diagnosed the mother as having intermittent explosive disorder and borderline personality disorder. Psychiatrist Robert Winsky, who also testified, evaluated the mother on August 25, 1986, and, concurring with Dr. Gallegos' diagnosis, concluded that the mother had no potential to resume custody and care of her children. Psychologist Miguela Rivera testified that she examined the mother in April 1988 and concurred, in pertinent part, with the prior diagnoses and prognoses.

Evidence was presented that because of the mother's mental retardation and borderline personality disorder, she was incapable of caring for the children and that they would, in fact, be at risk if placed in

her care. The mother's own therapist, who disagreed that the mother posed such a risk to the children, conceded that she could not recommend that the children be placed in her care and made no affirmative recommendation that the mother be placed in a residential program such as Casa C or the La Llave program. The testimony revealed that such programs require that the children be in the parent's custody, although they provide daily supervision.

The youngest child was taken into custody immediately after her birth in June 1987. Child Protective Services was contacted after hospital nurses reported that the mother appeared to have no plans for, and was lacking in basic knowledge regarding the care of, the infant. The youngest child was placed in a "Fost-Adopt" home on September 1, 1987, and, as of October 1987, there was a plan for her adoption.

On December 11, 1987, DES filed a petition seeking the termination of the mother's parental rights as to all three children.[1] The severance action was consolidated with the dependency actions pertaining to all of the children. Following a three-day hearing which commenced on May 5, 1988, the juvenile court terminated the mother's parental rights as to the two older girls, but refused to do so as to the youngest child. The court found that a dependency existed as to the youngest child, that the status of the two older children as dependents was to continue and that the La Llave program should be explored as an alternative for the mother with regard to the youngest child. In the trial court's findings of fact and conclusions of law, it found, in pertinent part, as follows:

### XIV

The natural mother ... suffers from a mental disorder which leads her to act in an erratic and explosive manner. Further, she suffers from mental retardation which precludes her from benefiting from therapy. She has received services, including various types of therapy from the [DES] over the years with essentially no change in her conditions.

### XV

Due to her mental disorder and mental deficiency, the natural mother is unable to discharge the parental responsibilities or to maintain a parental relationship. Although wishing to be a parent, the natural mother does not have a consistent or logical capacity to provide even the minimal requirements of nurturance and care that a child needs. Her limited cognitive capacity is such that there are no services available to remedy this condition.

### XVI

... There are reasonable grounds to believe that the mother's deficits in her capacity to provide appropriate care and control for her children will continue without change or improvement for an indefinite period in the future.

Based upon these and other findings of fact, including the finding that the mother had neglected the two older children and that they had been in out-of-home placement despite DES' diligent efforts to provide appropriate remedial services, the trial court concluded that there were sufficient grounds to terminate the mother's parental rights as to the two older children under A.R.S. § 8–533(B)(2), (B)(3) and (B)(6)(b).

### THE MOTHER'S APPEAL

The bases of the natural mother's appeal are as follows: (1) DES failed to make a diligent effort to provide her with services and assistance in order to preserve her parent-child relationship with the two older children; (2) the court committed reversible error in failing to find that it was in the best interests of the two older children that their relationships with their mother be severed; (3) DES failed to present clear and convincing evidence that the mother suffered from mental illness or that the

---

1. The petition sought to terminate the parental rights of the mother and the fathers of the children. This appeal relates only to the paren-

tal rights of the mother, not to the fathers of the children, whose rights were terminated.

mother's alleged mental illness or mental deficiency was severe and substantial; (4) the evidence was not sufficient to support the juvenile court's finding that the mother had neglected the two older children; (5) the evidence was not clear and convincing so as to justify the severance of her parental rights generally, and (6) she was inadequately represented by her counsel.

■ The juvenile court sits as the trier of fact in a termination proceeding and, on appeal, we must accept the juvenile court's ruling unless its finding is clearly erroneous. *Appeal In Maricopa County Juvenile Action No. JS-4374*, 137 Ariz. 19, 667 P.2d 1345 (App.1983). The juvenile court's findings will be upheld on appeal unless they are not supported by the evidence. *Appeal in Maricopa County Juvenile Action No. A-25525*, 136 Ariz. 528, 667 P.2d 228 (App.1983). The standard of proof in a termination proceeding is clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In the Matter of Maricopa County Juvenile Action No. A-26961*, 135 Ariz. 228, 660 P.2d 479 (App.1982). Where termination is sought pursuant to A.R.S. § 8-533(B)(3), clear and convincing evidence must establish that the parent suffers from mental illness or mental deficiency which prevents the parent from discharging the parental responsibilities and that there are reasonable grounds to believe that the condition will continue for a prolonged and indeterminate period of time. *Appeal in Maricopa County, Juvenile Action No. JS 5894*, 145 Ariz. 405, 701 P.2d 1213 (App.1985); *Appeal in Maricopa County Juvenile Action No. JS-5209 and No. JS-4963*, 143 Ariz. 178, 692 P.2d 1027 (App.1984). Based upon our review of the record before us, we believe that the evidence supports the juvenile court's findings in this regard. There was ample testimony from competent professionals, bolstered by the testimony of the maternal aunt, regarding the natural mother's explosive behavior and mental deficiencies, as well as the effect of her illness and deficiencies upon her ability to discharge her parental responsibilities.

■ The evidence also sufficiently established that no other services could be provided which had not already been offered that might preserve the family. Although the parent-child relationship should not be severed unless every effort has been made to preserve the relationship, *Appeal in Pima County Juvenile Action No. S-111*, 25 Ariz.App. 380, 543 P.2d 809 (1975), DES is clearly not obligated to provide services which are futile. *Appeal in Maricopa County Juvenile Action No. JS-5209 and JS-4963*, 143 Ariz. 178, 692 P.2d 1027 (App. 1984). Not even the natural mother's own therapist of over three years recommended that the children be placed in the mother's custody, without intensive supervision. The therapist conceded that it would be very difficult for her to care for them because of her mental deficiencies and lack of a strong family support system. Other evidence was present that the children would be exposed to a substantial risk of harm because of the mother's inability to cope with stress and anger. At the time of the severance hearing, the two older children had been out-of-home for over three years during which time the natural mother had been evaulated by pychiatrists and psychologists and provided with assistance through case management services and individual therapy. Under the circumstances severance was justified under A.R.S. §§ 8-533(B)(3) and (B)(6)(b).

Based upon the record before us, we cannot say that the juvenile court erroneously concluded that the two older children had been neglected. The evidence supports the trial court's conclusion that severance was warranted under A.R.S. § 8-533(B)(2).

■ We also reject the mother's argument that the juvenile court committed reversible error in failing to expressly find that severance was in the best interests of the children. Not only does the record before us support such a finding, it is implicit in the juvenile court's findings of fact, conclusions of law, and order of severance.

■ The mother's final argument is that she was not adequately represented at the trial level, primarily because her counsel

failed to call certain witnesses. These witnesses include her own therapist, who was called as a witness by DES and cross-examined by the mother's counsel. Although the therapist's testimony was more hopeful in terms of the mother's prognosis than that of the other witnesses, her testimony was not entirely favorable. The failure of the mother's counsel to call the therapist and the other individuals as witnesses was, we believe, a sound tactical decision, and there is no evidence to suggest that the mother was prejudiced thereby. Based upon the record before us, it appears that the mother was afforded adequate, effective assistance of counsel.

## DES' APPEAL ·

█ DES argues that in light of the trial court's findings and conclusions, it was inconsistent and erroneous to deny DES' petition to sever as to the youngest child. We agree.

The trial court found sufficient evidence to justify its express findings that the mother suffers from "a mental disorder which leads her to act in an erratic and explosive manner"; that "she suffers from mental retardation which precludes her from benefiting from therapy"; that DES provided her with various services over the years which essentially did not change her conditions; that she is "unable to discharge the parental responsibilities or to maintain a parental relationship" and *is unable to "provide even the minimal requirements of nurturance and care that a child needs"* [emphasis added]; that because of her "limited cognitive capacity," there are no services available which might help the situation; and that there are reasonable grounds to believe that the mother's deficits will continue for an indefinite period in the future. In reviewing the evidence regarding these findings in connection with the mother's appeal, we have already found such findings and conclusions were not erroneous. Because, as the trial court correctly found, the mother's mental illness and deficiency render her unable to discharge her parental responsibilities as to the two older children, we believe it has the

same impact upon her ability to parent the youngest child. There was, in fact, ample additional testimony to support this additional conclusion.

Of particular significance is the following testimony of Dr. Winsky, who evaluated the mother in August 1986:

Q. As a result of your evaluation, what diagnosis did you make of [the mother]?

A. On access, one mild mental retardation. Also at that time probably brief reactivity, psychosis involved in reference to her behavior in April of 1985, · intermittent explosive disorder, access to borderline personality disorder, paranoid dependency and antisocial features.

Q. Could you tell the Court to what degree a borderline personality disorder affects the ability of [the mother] to parent her children?

A. In this issue the borderline personality disorder can lead to under stress, stress defined as major stress, major upset or major demand on children's parents and important rules in parenting to being impulsive and erratic in the parenting of her children and at times potentially neglectful and abusive toward her children.

Q. And to what degree does—is her borderline personality disorder affected by her mild mental retardation, if at all?

A. It worsens or increases the chances of her having impulsive outbursts for behavior because mental retardation is existing and impairs her from really getting the best possible benefit from any psychotherapy or any counseling session in relationship to possible coping skills or in coping, skills in coping in mechanism with borderline personality disorder.

Q. And so to what extent do those two diagnoses together affect her ability?

A. In my opinion they create a one-on-one equal, three effects, you can't change either condition short or long-term therapy or medications. She, un-

fortunately, is going to suffer lifetime with these conditions.

\* \* \* \* \* \*

Q. If you assume, Dr. Winsky, that Dr. Rivera made the—reached the conclusion that the mother functions with an I.Q. of approximately 72 and that she concurs that the mother has an intermittent explosive disorder and a borderline personality disorder and if you further assume that since you have seen [the mother] she has had another child and that observation from hospital staff indicate an inability to parent or to provide child care for the infant, what affect, if any, does that have on your opinion that you had in August of 1986 regarding the mother?

\* \* \* \* \* \*

A. This question—compound question leads me to state that it confirms my diagnosis made in 1986. It is further evidenced that on my review confirms that [the mother] has very poor and limited parenting skills and these are based on diagnosis that I made in 1986.

Q. At this time, do you have an opinion whether the mother is able to discharge parental responsibility?

A. My opinion at this time is the mother cannot take care of her children at this time.

Q. And upon what is that based?

A. It is based on recent evidence that has been submitted to me especially in 1987 during the recent hospital stay concerning delivery and medical care of a newborn by the patient [the mother] and it is based on the past records that I have reviewed and my sessions with her back in 1986.

Q. And to what extent is her inability affected by the diagnosis that you have made of her?

A. There is documentation in her past history that I reviewed and in talking to [the mother] myself in 1986, in the formal sessions that she does not have really a mature, consistent, logical, coherent concept of what it is to be a parent. She has a strong desire to be a parent, period. She has no ability to actually parent.

She would very much like to be a parent and states that repeatedly to me in other information that I have reviewed. Her ability to actually parent is almost nil.

Dr. Winsky's conclusions clearly relate not just to the mother's ability to parent the two older children but any child, and, more specifically, the youngest child. We recognize that termination of parental rights based on mental illness requires that, in addition to proof of the illness and/or deficiency which inhibits the proper discharge of parental responsibility, that there be evidence of actual or likely harm to the child and that such danger to the child be shown in the form of the parent's inability to care for the child. *Appeal in Maricopa County Juvenile Action No. JS–5209 and No. JS–4963*, 143 Ariz. 178, 692 P.2d 1027 (App.1984). The clear and convincing evidence presented supports such a finding.

The juvenile court has recommended that the La Llave program be explored with regard to the youngest child. The mother rejected this program when it was initially offered to her and did not express an interest in it until two weeks before the severance hearing. More importantly, however, based upon the record before us, we think that such a program would not only be futile, given the nature of the mother's illness and deficiency, it would necessarily expose the youngest child to substantial risk of harm. Significantly, the trial court found and we have agreed, that any other programs or services of any kind would be futile as to the two older children. Where the evidence shows that efforts to reunite the family would be futile, failure to make such efforts does not violate the parent's due process rights nor is it in contravention of A.R.S. § 8–533. *Appeal in Pinal County Juvenile Action No. S–389*, 151 Ariz. 564, 729 P.2d 918 (App.1986).

CONCLUSION

We affirm the juvenile court's order terminating the parental rights of the mother with respect to the two older children. We reverse the juvenile court's order that the

mother's parental rights as to the youngest child not be terminated and direct the court to enter an order in accordance with this decision.

LIVERMORE, P.J., and HATHAWAY and HOWARD, JJ., concur.