159 P.3d 562

**VANESSA H., Appellant,**

v.

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY, Emely H., Appellees.**

No. 1 CA–JV 06–0086.

Court of Appeals of Arizona, Division 1, Department A.

June 12, 2007.

Review Denied Sept. 25, 2007.

Terry Goddard, Attorney General, by Carol A. Salvati, Assistant Attorney General, Phoenix, Attorneys for Appellees.

Sandra L. Massetto, Phoenix, Attorney for Appellant.

## OPINION

BARKER, Judge.

¶ 1 Vanessa H. ("Vanessa") appeals the termination of her parental rights with re-spect to her daughter, Emely H. ("Emely"). For the following reasons, we affirm.

### *Facts and Procedural History*

¶ 2 Vanessa was born on March 15, 1986. At age six, after having lived in group homes and shelters since birth, she was adopted and raised by both adoptive parents until age sixteen. At that time, she was placed in the physical custody of Child Protective Services ("CPS") "because of repeatedly running away." In June 2003, it was recommended that she participate in a residential program given her "history of noncompliance, running away, and frequent involvement with the legal system." Vanessa was placed in juvenile detention on drug use charges in 2003 when she was four months pregnant with Emely. She also received services from the Division of Developmental Disabilities throughout this period and after. The record also shows allegations of egregious misconduct, including forcible sexual conduct, allegedly perpetrated against Vanessa while either in State care or under the supervision of those whom the State had entrusted to care for Vanessa.

¶ 3 Vanessa's IQ, most recently measured at 53, places her in the "mild to moderate mentally retarded range."[1] Test results from August 2003 indicated that her achievement scores were "below 3rd grade level in all broad areas" and below the second or first grade levels in some areas. A June 23, 2003 psychiatric evaluation included the following additional diagnoses for Vanessa: conduct disorder, cocaine abuse, learning disorder, psychosocial past history, relational issues, painful memories and substance use.

¶ 4 On March 25, 2004, Vanessa gave birth to Emely. On July 10, 2004, CPS removed Emely from Vanessa's care after Vanessa left Emely alone in a grassy area in an apartment complex for several hours, not returning until after the police had arrived. In a July 18, 2004 report to the juvenile court, a caseworker wrote that Vanessa "is not able to adequately care for Emely if she remained independent of a responsible adult."

---

**1.** An intelligence test administered when Vanessa was twelve years old and tests from August of 2003 and 2004 indicated IQs of 51, 58, and 53, respectively.

¶ 5 The State offered various services to Vanessa in an effort to rehabilitate her, including instruction from a parent aide, supervised visitation with Emely, and individual counseling. Vanessa lived in eight different placements from July 2004 through February 2005. Her behavior during this period included refusal to clean her room or bathroom, slamming doors, starting verbal fights with caretakers, being argumentative and depressed, throwing objects, yelling, threatening harm when she did not get her way, and overdosing on medications. In a February 2005 report, the case manager concluded that

Vanessa [ ] does not have the skills to take care of herself and also lacks the ability to care for a young child. [Vanessa] has twice in the past two months attempted to commit suicide. A child left in her care would not be safe from harm.... While [Vanessa] does have some child care skills, (she is able to put Emely in a car seat and appropriately fasten it), she is not able to meet the health, safety, social, medical, and emotional needs of a child. A child in her care would be at risk of neglect or abuse.

¶ 6 A June 19, 2005 report to the court concluded that "[i]t is not realistic to anticipate that performance will improve if the time frame for compliance is extended" because of Vanessa's "cognitive deficits and mental health issues."

¶ 7 During her visitations, Vanessa "holds Emely, kisses and hugs her child, laughs with her child, plays games with her child, sings to her child, [and] feeds and diapers her child." The parent aide noted that Vanessa "often forgets snacks and water for the formula, forgets to use the highchair, forgets she must keep an eye on her child at all times, forgets appointment times, forgets what time it is, and forgets to give Emely safe toys.... [S]he must be supervised when caring for her child."

¶ 8 On August 10, 2004, Dr. Julio F. Angulo performed a psychological evaluation of Vanessa. A caretaker for Vanessa made several observations concerning Vanessa's behavior and abilities to Dr. Angulo. When Vanessa lived with her adoptive mother, she would leave Emely for "days and nights at a time." Vanessa was able to maintain her hygiene and grooming without assistance because she was self-conscious about her appearance. She could use the phone on her own. She could not count money, shop, manage a checkbook or household finances, prepare meals, or complete household chores on her own. She would typically forget to turn a stove or oven off if she used it. The caretaker also reported that Vanessa "has strong needs for attention and affection of males." "If a boy or adult male pays attention to her, she drops whatever she is doing to attend to that male. If unsupervised, she is likely to impulsively leave with that male—without thinking about the consequences." During the interview, Vanessa "did not know the current year, month, day of week or even the approximate time of the day."

¶ 9 Dr. Angulo noted that Vanessa "typically acts without thinking about the consequences that her actions have for her safety or the safety of others." She "displays markedly poor judgment and engages in risky activities whether it is drug abuse or running around in the streets for days, or engaging in promiscuous sex or prostitution." She has no history of independent living and "is incapable of discharging most everyday tasks without prompt and or supervision—child-rearing tasks and responsibilities included." Dr. Angulo said that because of her diagnosed disorders and attendant deficits, "her ability to parents [sic] is considered to be impaired. Under her care, her child will be at risk for neglect and/or abuse." Dr. Angulo recommended specially designed services given Vanessa's limited cognitive abilities, but emphasized that even with such specialized services, "the prognosis for significant changes [is] poor." In the end, Dr. Angulo opined that "Vanessa might not be able to assume the daily tasks of parenting, unless she is constantly prompted and supervised."

¶ 10 On August 13, 2005, Dr. Joel E. Parker conducted a psychiatric evaluation of Vanessa. In Dr. Parker's opinion, Vanessa's "clear cognitive limitations ... would interfere with her ability to safely parent any child." Dr. Parker concluded that Vanessa "is unlikely to ever become a minimally adequate parent because of these cognitive limi-

tations." Dr. Parker did not believe that additional services were appropriate or that they would be "likely to improve her condition to any appreciable extent." Dr. Parker did "not believe that the [child] will ever be safe to return home. [Vanessa's] cognitive limitations are simply too severe for [the child] ever to be safe under her care." [2]

¶ 11 Kristi teKampe, Vanessa's assigned counselor, wrote in a June 2005 report that Vanessa's "disability will be a barrier throughout her lifetime regardless the number of counseling sessions she participates in as she does not have the cognitive ability to retain what is learned." She did not believe that continued counseling would prepare Vanessa for parenting. At trial, teKampe testified that all the services she thinks could have been offered to Vanessa had been offered, but that Vanessa was still unable to parent her child.

¶ 12 Myriam Barajas, the CPS case manager, testified that as of the time of trial, Vanessa was living in a group home with twenty-four hour monitoring, transportation, and supervision. She expressed several concerns for Vanessa's parenting abilities: "[Vanessa is] unwilling to provide proper snacks even when she's told what they are. [Vanessa's] inability to learn from the one-on-one sessions when she is visually taught about nutrition, clothing sizes, appropriate toys, [her] inability to bring proper gifts to the child. At one time she gave her money, gave her coins, and she was putting them in her mouth."

¶ 13 Vanessa testified at trial. She was asked what it costs to rent an apartment. She replied, "Like $60 or more than that." Vanessa said she did not know where she would go to live if Emely were returned to her.

¶ 14 Turning to the procedural history, the Arizona Department of Economic Security ("ADES") filed an amended dependency petition on August 12, 2004. The court declared Emely dependent as to Vanessa on August 31, 2004. ADES filed an amended motion for termination of the parent-child relation-

ship on November 9, 2005. One of the alleged grounds was that Vanessa was unable to discharge her parental responsibilities due to mental illness and/or mental deficiency. The severance hearings were held on February 28 and March 7, 2006. The trial court granted the motion to terminate the parent-child relationship on the grounds that Vanessa was unable to discharge her parental responsibilities due to mental illness or mental deficiency. The court found, among other things, that "[Vanessa] requires twenty-four [hour] assisted living and will require that level of care indefinitely. [Vanessa] is unable to provide for her basic needs or the needs of Emely." The court found that the condition would continue for a prolonged indeterminate period of time.

¶ 15 Vanessa timely appealed. This court has jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 8–235 (2007).

### Discussion

¶ 16 Termination of the parent-child relationship is appropriate if the statutory grounds are supported by clear and convincing evidence. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4, 53 P.3d 203, 205 (App.2002). "[W]e will accept the juvenile court's findings of fact unless no reasonable evidence supports those findings, and we will affirm a severance order unless it is clearly erroneous." *Id.*

¶ 17 In order to terminate a parent-child relationship, the court must find by clear and convincing evidence one of the enumerated statutory grounds. A.R.S. § 8–533(B) (2007). These grounds include the following: "That the parent is unable to discharge the parental responsibilities because of mental illness [or] mental deficiency ... and there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period." *Id.* at (B)(3).

¶ 18 As an element of termination under A.R.S. § 8–533(B)(3), the State is required to demonstrate that it has "made a reasonable effort to preserve the family."

---

2. In response to a question from the court, Dr. Parker stated that as Emely gets older, assuming she develops normally, she will at some point

"become more clever than the parent." This will "present some problems in terms of the parent's ability to manage the child."

*Mary Ellen C. v. Ariz. Dep't of Econ. Sec.,* 193 Ariz. 185, 192, ¶ 33, 971 P.2d 1046, 1053 (App.1999). "This principle does not oblige the State to undertake rehabilitative measures that are futile." *Id.* at ¶ 34, 971 P.2d 1046. If the State is obligated to undertake rehabilitative measures, however, it must "undertake measures with a reasonable prospect of success." *Id.* In sum, the State must "prove by clear and convincing evidence that it ha[s] made a reasonable effort to provide [the parent] with rehabilitative services *or* that such an effort would be futile." *Id.* at 193, ¶ 42, 971 P.2d at 1054 (emphasis added).

▇ ¶ 19 Vanessa argues on appeal that the State did not make reasonable efforts to preserve the parent-child relationship. Because reasonable efforts are an element of termination, *id.* at 192, ¶ 33, 971 P.2d at 1053, Vanessa claims that the trial court erred in terminating her parental rights as the State did not make "reasonable efforts" to provide services to preserve the family. Other than this argument, Vanessa does not challenge the court's findings that she was unable to discharge her parental responsibilities because of mental deficiency and that such condition would continue for a prolonged indeterminate period of time. The State argues that the trial court should be affirmed as the evidence supports a finding that providing such services would have been futile. We agree.

▇ ¶ 20 We do not have any quarrel with the dissent's assertion that "reasonable efforts" includes seeking to reasonably accommodate disabilities from which a parent may suffer. We view reasonable accommodations as a component of making "reasonable efforts." *See Mary Ellen C.,* 193 Ariz. at 192, ¶ 33, 971 P.2d at 1053. Without commenting on the standard or approach that the dissent lays out in this regard, one fundamental flaw in the dissent's position is that on this record there is abundant evidence showing that no amount of "reasonable efforts" in providing services would have enabled Vanessa to function as a minimally adequate parent. This is particularly so when we view the evidence, as we must, in a light most favorable to affirming the trial court. *Maricopa County Juv.*

*Action No. JS–8490,* 179 Ariz. 102, 106, 876 P.2d 1137, 1141 (1994) ("We view the facts in a light most favorable to affirming the trial court's findings."). With all due respect, the dissent is simply mistaken when it contends that "there is nothing to support the conclusion that [Vanessa] would not benefit from appropriate services." There is an abundance of such evidence.

¶ 21 For instance, Dr. Parker gave the following answers to the following questions:

[Question] Are there services that could be provided to improve [Vanessa's] condition? If so, what specific services are recommended?

[Answer] *I do not believe that any additional services are appropriate for [Vanessa]. ... I do not believe that any additional services are likely to improve her condition to any appreciable extent.*

[Question] What is the prognosis that the parent will be able to demonstrate adequate parenting skills in the foreseeable future?

[Answer] Vanessa's prognosis is extremely poor. Her mental retardation, confounded by her mood disorder, personality disturbance, and history of abusing substances, indicate that she is unlikely to ever become a minimally adequate parent.

[Question] *Even with the proposed interventions, do you feel that she will be able to discharge parental responsibilities in the foreseeable future?*

[Answer] *No,* as above.

[Question] Given history of substance abuse, what period of sobriety/abstinence is required for the parent before the children can safely return home?

[Answer] *As indicated above, I do not believe that the children will ever be safe to return home. [Vanessa's] cognitive limitations are simply too severe for them ever to be safe under her care.*

(Emphasis added.) Kristi teKampe, Vanessa's assigned counselor, also opined that Vanessa's "disability will be a barrier throughout her lifetime *regardless [of] the number of counseling sessions* she participates in. She does not have the cognitive ability to retain what is learned." A report

to the juvenile court also concluded that "[i]t is not realistic to anticipate that performance will improve if the time frame for compliance is extended" because of Vanessa's "cognitive deficits and mental health issues."

¶ 22 There was, as the dissent notes, some potentially contradictory evidence including Dr. Angulo's testimony that with specialized services "the prognosis for significant changes [is] poor," rather than futile. The trial court, however, is specifically charged with resolving conflicts in the evidence. *Lashonda M. v. Ariz. Dep't of Econ. Sec.*, 210 Ariz. 77, 82, ¶ 16, 107 P.3d 923, 928 (App. 2005) ("conflicts in the evidence are for the fact-finder to resolve"); *Jesus M.*, 203 Ariz. at 282, ¶ 12, 53 P.3d at 207 ("The resolution of such conflicts in the evidence is uniquely the province of the juvenile court as the trier of fact; we do not re-weigh the evidence on review."). That is not an appellate function. *Id.* Dr. Parker opined that Vanessa's "cognitive limitations are simply too severe for [the child] to ever be safe under her care." The trial court could reasonably rely on this and the other abundant evidence.

¶ 23 The dissent also points to allegations of "mistreatment, exploitation, and rape at the hands of the very placement staff with whom [Vanessa] was entrusted." *Infra* ¶ 57. As disturbing as these allegations are,[3] the dissent does not consider that the evidence of these allegations was also before the trial court. The trial court was able to consider this evidence, as well as all the other evidence, in determining whether "the parent is unable to discharge [her] parental responsibilities because of mental illness [or] mental deficiency." A.R.S. § 8-533(B)(3). The trial court determined, and the evidence supports, that the statutory mandate was met. Thus, regardless of the allegations of misconduct, the statutory requirements were nonetheless satisfied.

¶ 24 The dissent also suggests that our decision is based on "erroneous assumptions about the parenting ability of the mentally disabled." *Infra* ¶ 27. On the contrary, we make no decisions based upon attributes that may or may not be shared by others who have similar disabilities to Vanessa. Our decision is based on the evidence that pertains to Vanessa. *Supra* ¶¶ 3–13, 21.

¶ 25 To conclude, there was clearly evidence in the record to support a determination that the provision of further services to Vanessa would be futile. Because the State satisfied this requirement and there are no other contested issues on appeal, we affirm the trial court's termination of Vanessa's parental rights under A.R.S. § 8-533(B)(3).

### Conclusion

¶ 26 The judgment of the trial court is affirmed.

CONCURRING: G. MURRAY SNOW, Presiding Judge.

KESSLER, Judge, dissenting.

¶ 27 I respectfully dissent. To accept ADES's assertion that the services it failed to provide were futile is to excuse the derogation of its court-imposed, constitutional, and statutory duties. Further, a comprehensive review of the record demonstrates the conclusions of ADES, the juvenile court, and the majority are premised upon erroneous assumptions about the parenting ability of the mentally disabled. Absent these assumptions, there is no meaningful indication that reasonable reunification efforts would not have equipped Vanessa with the ability to care for her child.

### FACTUAL AND PROCEDURAL HISTORY[4]

¶ 28 Vanessa is mentally disabled. She has consistently been diagnosed with mild to

---

3. The record shows the following as to the allegations of rape and related conduct as contained in the June 19, 2005 Report to Juvenile Court for Permanency Hearing:

   [I]n the March 2005 notes is a statement by [Vanessa] that one of her mentors would take her out in the morning not to visit with her child but to visit the mentors', [sic] friends, party and do drugs. This in fact did occur and [Vanessa] did alleged [sic] that she was in fact raped by a friend of her mentor. When [Vanessa] mentioned the situation to management staff at Mentor [sic] an investigation of the situation did occur.

4. I do not think the majority's statement of facts is in any way erroneous. I do believe, however,

moderate mental retardation, with an IQ scale in the fifties.[5] At age seventeen she was achieving below a third grade level. In addition, she was diagnosed with a childhood onset conduct disorder and a learning disorder. After an evaluation conducted when Vanessa was seventeen years old, a psychiatrist noted that her psychosocial stressors included past history, relational issues, painful memories, and legal issues. Two psychiatrists have noted that her insight and judgment are impaired. While Vanessa reported substance abuse during her adolescent years, she terminated her substance abuse while she was pregnant with her daughter.

¶ 29 Vanessa is no stranger to ADES, as she been in the care of the State for a significant part of her life. She was removed from her home at birth and lived in group homes and shelters until she was adopted at the age of six. She was placed in the physical custody of Child Protective Services ("CPS") when she was sixteen years old. During that time, she reported conflict in her placements because they would tell her what to do or hit her for no reason. Vanessa also reported that, when she was sixteen years old, she was repeatedly molested and raped by "a stepbrother," and that she was later repeatedly beaten and raped by a male friend. Vanessa now displays a strong need for male attention and affection and does not display appropriate physical boundaries with males she has recently met. Vanessa has concurrently received services from the Division of Developmental Disabilities ("DDD") for an extensive period of time.

¶ 30 Vanessa discovered she was pregnant with Emely while she was in juvenile detention on drug use charges when she was seventeen years old. During this period of detention, Vanessa needed prompts for personal hygiene and prenatal care.

Emely was born on March 25, 2004, ten days after Vanessa's eighteenth birthday.

¶ 31 According to CPS reports, on July 10, 2004, Vanessa left Emely unattended in a grassy area [6] in an apartment complex. She did not return until several hours later, after the police arrived.[7] The police took Emely to the hospital, and the hospital notified CPS, who removed Emely to a foster home. Vanessa was placed in a DDD group home the following day.

¶ 32 ADES filed a dependency petition on July 22, 2004. The court conducted a hearing on the petition on August 31, 2004. At that hearing, ADES entered into evidence a CPS report and addendums. In the report, dated July 18, 2004, the CPS case manager assigned to Vanessa stated:

> [Vanessa] has been involved with DDD for an extended period of time and services have been attempted to assist [Vanessa] and Emely, however [Vanessa] appears to be resistant to services. Prognosis for a successful reunification of Emely with her mother is guarded. *This prognosis would improve if [Vanessa] was able to remain with a "monitor" who could assure that she would be responsive to the daily needs of her daughter.* It is this worker's belief that the mother is not able to adequately care for Emely *if she remained independent of a responsible adult.*

(Emphasis supplied). Attached to the report was an August 10, 2004, psychological evaluation of Vanessa. In addition to noting that Vanessa was mildly mentally retarded, the psychologist stated:

> Due to the diagnosed disorders and attendant deficits, her ability to parents [sic] is considered to be impaired. Under her

---

the factual and procedural history reveals a different picture of Vanessa and her case history when placed in context.

**5.** Vanessa could therefore be characterized as "trainably mentally retarded," or "educably mentally retarded." *See* Hayman, Jr., Robert L., *Presumptions of Justice: Law, Politics and the Mentally Retarded Parent,* 103 Harv. L.Rev. 1201, 1214 (1990) ("Hayman").

**6.** According to Vanessa, two men took Emely from her and then took her to someone's home over Vanessa's objection.

**7.** The record is not clear as to Vanessa's living situation at the time of this incident. One CPS report indicates Vanessa was living with a friend, while Vanessa's testimony at trial indicates she was living with her adoptive mother. Regardless, Vanessa was not in a DDD placement at this time.

care, her child will be at risk for neglect and/or abuse.

Vanessa is in need of services ... such as parent training, impulse and anger management. Due to her limited intellectual and cognitive abilities, however, *it is doubtful that she will be able to participate successfully in these programs and services—unless they are designed specifically for individuals with special needs like Vanessa*. That is to say, individuals functioning [at] the mild to moderate level of mental retardation; individuals with serious impairments in their ability to attend and concentrate and with a deficit in their ability to transform an imparted teaching into a practical skills [sic].

I view the prognosis for significant changes as poor, even with specialized services in place.... *Further, due to her intellectual and cognitive deficits and her inability to manage impulses effectively, her progress in restoring her parenting capacities will be very slow at best—taking 12 months or longer to demonstrate minimal gains.*

*Finally, it should also be kept in mind that, in the end, Vanessa might not be able to assume the daily tasks of parenting, unless she is constantly prompted and supervised.*

(Emphasis supplied). The report further noted that Vanessa was removed to another placement in August 2004 after Vanessa became violently angry during a dispute with her respite care provider.

¶ 33 On August 31, 2004, the court found Emely dependent due to Vanessa's diagnosis of mild mental retardation and neglect. The court determined the case plan was family reunification and ordered the following services: anger management classes, parent aide services, psychological evaluation, any other services recommended by the DDD case manager, urinalysis, substance abuse treatment, transportation, and psychological evaluation recommendations.

¶ 34 Progress on the case goal of family reunification was initially slowed by Vanessa's living situations. Between August 2004 and November 2004, Vanessa was moved three times to new placements. The third placement was with a family with two small children. This placement afforded Vanessa the opportunity to learn to care for a small child. Vanessa responded negatively to the placement, though, presumably because she was jealous that the mother in the home had a home and a family with children.[8] She repeatedly argued with the mother, and twice attempted suicide. When Vanessa was released from the hospital after her second suicide attempt, she was moved to a different placement. She was again subsequently transferred[9] multiple times to different placements.

¶ 35 CPS also delayed services for Vanessa. CPS did not complete the request for parent aide services until November 30, 2004, three months after the court ordered services for Vanessa. The intake process for parent aide services commenced even later, on February 2, 2005, five months after the services were ordered.[10] According to a CPS report, the request for counseling services was received in early December 2004, almost four months after such services were ordered.[11] Vanessa began meeting with a counselor in January 2005 to address anger,

8.  The CPS case manager's notes indicate that she visited Vanessa in this placement. There are numerous instances in the record, however, of reports that CPS personnel were unable to locate Vanessa when she transferred between placements.

9.  Vanessa's counselor noted with regards to one transfer that the CPS case manager was unaware that Vanessa was going to move to another placement.

10.  According to CPS reports, Vanessa was provided with a Human Services worker to supervise visitation and help her learn how to care for a child until a parent aide became available. One report states Vanessa was unable to grasp the knowledge necessary to maintaining a baby in her presence as a result of this service. There is no further information about the nature of these services in the record.

11.  At trial, the case manager testified that the referral for counseling was made in August 2004 and that from August 2004 until December 2004 CPS was unable to locate Vanessa as her placements changed.

depression, and independent living.[12] In late January, Vanessa was reassigned to a bilingual counselor because she had been moved to a Spanish-speaking placement.

¶ 36 The court conducted its first report and review hearing on February 15, 2005, only weeks after reunification services commenced. At that hearing, Vanessa objected to the delay in providing appropriate counseling and parent aide services. In addition, both Vanessa's guardian ad litem and the CPS case manager discussed the need for a parent aide who could teach Vanessa demonstratively. ADES stated that CPS had experienced difficulty in locating and processing a request for a specialized parent aide for Vanessa and in coordinating with Vanessa's DDD case manager. At the close of the hearing the court found that ADES had *not* made reasonable efforts to reunify Vanessa and Emely. The next report and review hearing was scheduled for June 30, 2005.

¶ 37 Vanessa thereafter continued in her counseling sessions. Early on, Vanessa stated that one of her treatment goals was to establish stability so that Emely could be returned to her custody. In late February, Vanessa requested to work with the counselor who had initially conducted her counseling services. Although the initial counselor assumed Vanessa's case in March, she was not able to meet with Vanessa during that month because Vanessa was not in a stable placement.

¶ 38 Vanessa also continued to meet with her parent aide and have supervised visitation with Emely. The parent aide notes reflect that Vanessa was affectionate toward Emely, feeding her, playing games with her, singing and dancing with her, and kissing and hugging her. Likewise, the parent aide notes indicate Emely responded affectionate-

ly and positively to Vanessa, and identified her as "Mama."

¶ 39 In March 2005, however, Vanessa's counselor became concerned that Vanessa's parent aide was giving her packets of written material to read and using a doll to demonstrate appropriate care. Her counselor noted such training techniques were inappropriate given Vanessa's developmental disabilities and recommended a parent aide that specializes with developmental disabilities. Nonetheless, the record does not indicate a change in parent aide,[13] and the parent aide continued to use written materials and indirect demonstrative strategies.

¶ 40 Vanessa's living circumstances further complicated the problematic provision of services. In March 2005, Vanessa's assigned mentor took her to a friend's house to party and do drugs during the time that Vanessa was supposed to visit Emely. Vanessa was raped at that time by one of the mentor's friends. Vanessa was then moved to another placement. There, she had an altercation with the staff in which they "[t]ormented her, removed the door from her room, and hid the phones from her so that she could not call for help." The CPS case manager noted that, in some instances Vanessa was moved due to circumstances she created. In other instances, "situations happened to her that made her life more difficult," and resulted in needless moves that placed stress upon her when her situation was already fragile.

¶ 41 In April 2005, the parent aide noticed Vanessa was tired toward the end of her visits[14] and suggested decreasing the visit time from two hours to one hour. Vanessa agreed. At the same time, the one-on-one parent aide training sessions were consolidated into the visitation sessions at the request of Vanessa's group home staff.

---

12. At trial, Vanessa's counselor described their meetings as "very sporadic" due to changes in Vanessa's placements, miscommunications with her group homes, and difficulty getting authorization from CPS. She further testified that Vanessa refused to attend counseling after the service was transferred to another provider shortly before the trial.

13. The case manager described the parent aide as "very good with giving parent aide services to

persons that are developmentally disabled" in a report to the court. However, the record does not indicate she has any specialized qualifications for working with the developmentally disabled.

14. The visitation sessions had been scheduled such that Vanessa attended a full day of classes and then went straight to her supervised visits.

¶ 42 For reasons not reflected in the record, yet a different counselor began meeting with Vanessa for her counseling sessions in April 2005. This was a month after she had been reassigned to her initial counselor. Vanessa resumed meeting with her initial counselor in May 2005, and spent an entire therapy session reestablishing a rapport with her counselor. It was not until late May, four months after she had commenced counseling sessions and nine months after the court ordered counseling services, that Vanessa and her counselor developed a treatment plan. In June, the counselor who had met with Vanessa in April met with Vanessa again. Vanessa again requested her initial counselor. The case was reassigned to Vanessa's initial counselor.

¶ 43 In early June 2005, Vanessa reported to her parent aide that, after seeing Emely crying as she left a visit, Vanessa became upset and attempted to commit suicide. Thereafter, Vanessa realized she was wrong, and she discussed with her parent aide how children cry for different reasons and parents cannot become upset and react by attempting suicide.

¶ 44 Also in June, Vanessa's counselor observed an incident in which Vanessa was unable to purchase cigarettes. Vanessa did not have a government-issued form of identification and her group home staff did not take her to obtain one. The counselor noted Vanessa "is under the control of others which can cause her to become agitated over the trivial—making the stressors of her CPS case more stressful." During subsequent visits that month, as the June report and review hearing approached, Vanessa's counselor observed that Vanessa grew increasingly anxious. She believed that Emely would soon be taken from her, and often cried uncontrollably.

¶ 45 During a psychiatric evaluation conducted in August 2005, Vanessa expressed her desire to be placed in a structured environment in which she could care for Emely. The psychiatrist stated:

A child under Vanessa's care would be at greatest risk for neglect. She has clear cognitive limitations that would interfere with her ability to safely parent any child. She has limited ability to manipulate the environment for her own purposes (using the phone or the bus), and would have greater challenges caring for a child. She reportedly left her daughter in the care of others for several days, and has significant difficulties understanding time. A child under her care is therefore at greatest risk for neglect.

Vanessa has been aggressive in the past, and a child therefore could be at some risk for abuse. She has attempted suicide several times, and is prone to impulsive rages, as documented in the DDD incident reports.

* * *

Vanessa's mental retardation is likely to be lifelong. Mental retardation is a developmental disability where intellectual capacity does not improve over time. She is unlikely to ever become a minimally adequate parent because of these cognitive limitations.

Her substance abuse condition appears to be managed at present, but parenting issues remain a concern. Her depressive condition likewise has benefited from medication. Still, her long-term prognosis as a parent is still of great concern.

¶ 46 On October 11, 2005, one year after Emely had been adjudicated dependent and nine months after Vanessa commenced parent aide and counseling services, ADES moved to terminate the parent-child relationship between Vanessa and Emely. The motion alleged Vanessa was unable to discharge her parental responsibilities because of a mental illness and/or deficiency, and there were reasonable grounds to believe the conditions would continue for a prolonged indeterminate period of time.[15] ADES later amended the motion to allege that Emely had been in an out-of-home placement for a period of fifteen months or

---

15. ADES also alleged Emely had been in an out-of-home placement for a period of nine months or longer and Vanessa had substantially neglected or willfully refused to remedy the circum- stances leading to the out-of-home placement. ADES withdrew this allegation on the date of the hearing.

longer, that Vanessa had been unable to remedy the circumstances leading to the out-of-home placement, and that there was a substantial likelihood that Vanessa would be unable to exercise proper and effective parental control in the near future.

¶ 47 In a subsequent supervised visit, Vanessa was quiet and told her parent aide "she was sad because everyone was telling her that she was not getting her baby back."

¶ 48 The court conducted a trial on the motion to sever over two days on February 28, 2006, and March 7, 2006. Vanessa's counselor testified about the grief counseling she conducted with Vanessa. She stated Vanessa's visitation schedule, in which she would regularly see Emely, become attached to her, and then have to leave her, put Vanessa in a constant state of grief.

¶ 49 Importantly, the CPS case manager testified it would have been possible for CPS and DDD to locate a placement where Vanessa and Emely could have lived together with supervision. She admitted CPS and DDD had failed to follow through on such a placement.[16]

¶ 50 Both counsel for Vanessa and her guardian ad litem argued against severance. Counsel for Vanessa argued inter alia that the State had failed to provide adequate services, and had failed to allow her sufficient time, given her limitations, to benefit from those services. As part of this argument, counsel for Vanessa urged that the State had an obligation to locate an assisted living placement in which she could parent Emely under supervision. Vanessa's guardian ad litem further argued that, according to the evidence presented, Vanessa's cognitive limitations did not prevent her from parenting Emely. Rather, the evidence indicated that it was her behavioral health issues that posed a barrier to parenting, and those issues were amenable to treatment.

¶ 51 At the close of arguments, the court stated:

This is a situation where because of cognitive disabilities there has been an inability to reunify mother with the child. Mom has done very well in trying to comply with services.

* * *

*Vanessa needs [a] 24–hour assisted living facility. She can't care for Emely on her own.* Mom doesn't have a good concept of what it would take to run a home. Her actions don't coincide with what she verbalizes. She would—[Vanessa's counselor] also testified that she would definitely fear for the safety of the child if the child was with mom. And even with services it would still be two or three years before she could parent.

* * *

The Court does believe that the State has proven that mom, and this is by clear and convincing evidence, that mom is unable to discharge her parental responsibilities, because of a mental illness or mental deficiency, and there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period of time.

I don't believe that it has anything to do with substance abuse or drugs at all in this particular case.

The long and short of it is that Vanessa can't even take care of herself, and will never be able to take care of herself, at least according to the reports and the testimony. *And that because of that she's not going to be able to ever, unless someone assists her, to take care of this child. She's never going to be able to do it on her own without some sort of assistance.*

(Emphasis supplied). The judge further declined to find ADES had proven that Vanessa had neglected to participate in services. He reasoned that, even though Vanessa had participated in the services provided, she had not been able to do so in a meaningful manner given her limitations. Accordingly, the

16. The CPS case manager also testified that, depending upon what kind of day Vanessa was having, she might physically discipline Emely by hitting her on the hand and pushing her to the side. When further questioned about this statement, the case manager stated that she was only aware of one or two documented instances in which Vanessa had physically disciplined Emely. There is one instance of physical discipline in the record, in which Vanessa "patted" Emely's hand as a warning, and was immediately instructed on refraining from physical discipline.

court granted ADES's motion based upon Vanessa's mental illness or deficiency and ordered the parent-child relationship between Vanessa and Emely severed.

## ANALYSIS

¶ 52 In proceedings to terminate a parent-child relationship, both the parent and the child share a vital interest in preventing the unjustified termination of their natural relationship. *Santosky v. Kramer*, 455 U.S. 745, 759–61, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). This interest should be provided heightened procedural protections. *Id.* Accordingly, the parent-child relationship may only be severed "in the most extraordinary circumstances, *when all other efforts to preserve the relationship have failed.*" *Matter of Maricopa County Juv. Action No. JA 33794*, 171 Ariz. 90, 92, 828 P.2d 1231, 1233 (App.1991) (emphasis supplied). To that end, before a parent-child relationship is terminated, the State is obliged "to undertake measures with a reasonable prospect of success." *Mary Ellen C. v. Arizona Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34, 971 P.2d 1046, 1053 (App.1999). *See also* A.R.S. § 8-846(A) (2006) (if child is removed from home, court shall order ADES to make reasonable efforts to provide services to child and parent). The State is not obliged, however, to undertake futile rehabilitative measures. *Mary Ellen C.*, 193 Ariz. at 192, ¶ 34, 971 P.2d at 1053.

¶ 53 This case presents us with a question left unanswered by *Mary Ellen C.*: when and how may constitutionally and statutorily mandated rehabilitative measures be deemed futile? ADES, the juvenile court, and the majority err in their response to this question for several reasons. First, ADES may not usurp the court's function of determining whether rehabilitative efforts are futile by neglecting to undertake them in a reasonable manner and then arguing at severance that the measures it did not undertake would have been futile. Second, rehabilitative measures are not futile for the sole fact that a parent's mental condition is immutable.

Third, rehabilitative measures are not futile simply because a parent will not be able to parent independent of services.

## I. Who May Determine Futility

¶ 54 In this case, ADES has consistently maintained that, regardless of whether it engaged in the required effort to reunify Vanessa and Emely, any services were futile. ADES in fact does not argue on appeal that it ever offered services with a reasonable prospect of successfully reunifying Vanessa and Emely.[17] Instead, the sum of ADES's argument in support of the termination order is that "*any* effort to reunify Mother and Emely was futile." (Emphasis supplied). This position sheds some light on how ADES mishandled the case from the outset, both as to delays and inadequate services. Indeed, by concluding in advance that services were futile, CPS made futility a self-fulfilling prophesy.

¶ 55 When the court adjudicated Emely dependent, it stated the case goal was reunification and ordered services, presumably for the purpose of achieving that goal. At the time this order was entered, ADES had an extensive history with Vanessa, as well as a psychological evaluation of Vanessa. ADES clearly was aware of how the services would have to be conducted to have any reasonable opportunity of achieving family reunification. That is, they would have to be administered over a period of time, tailored to Vanessa's mental capacity, and remedial to behavioral issues. The case manager's own assessment acknowledged this. ADES took no heed to providing services in this manner. As a result, they were indeed futile from the outset.

¶ 56 The time frame in which ADES provided the services did not afford Vanessa an opportunity to participate in them successfully. There was a period of three months between the time the court ordered counseling and parent aide services for Vanessa and when CPS initiated the application process for such services. As a result, Vanessa did not even commence these services until almost five months after the court ordered the

---

**17.** This could be deemed a confession of error. *Burton v. Burton*, 23 Ariz.App. 159, 163, 531 P.2d 204, 208 (1975).

services. The delay was so objectionable that the court found ADES was *not* making reasonable efforts to reunify Emely and Vanessa. Nonetheless, a mere eight months after parent aide and counseling services had tardily commenced, ADES moved to terminate. The court conducted the trial on the motion a little over a year after Vanessa had finally commenced services. It is difficult to see how such a short duration of services could bear a reasonable prospect of success. This is especially true given that, at the outset of the proceedings a psychologist had stated that it would take at least a year to restore her parenting capacities given her developmental needs. Surely additional time to allow Vanessa an opportunity to benefit from these services could not have been unreasonable in light of the amount of time CPS took to start the services in the first place.

¶ 57 Even after Vanessa's services were commenced, they could not feasibly be labeled, "measures with a reasonable prospect of success." It is clear from the record that CPS was well aware from the outset of the case that Vanessa's developmental disabilities necessitated programs and services tailored to those disabilities. A thorough examination of the record, however, reveals that Vanessa's interlude with CPS and DDD was nothing short of tormented, fluctuating, and inhospitable to a woman with developmental disabilities. She was passed between numerous placements, at times due to her behavior, but at other times due to mistreatment, exploitation, and rape at the hands of the very placement staff with whom she was entrusted. Similarly, she was passed between multiple therapists, and did not begin consistent counseling with one therapist with whom she had developed a rapport and a treatment plan until four months after the counseling service had commenced, and six months be-

fore ADES moved to terminate. In addition, the suitability of Vanessa's parent aide services is questionable. There is nothing in the record to indicate the parent aide's qualification to work with developmentally disabled persons. The record in fact indicates she was using instructional techniques inappropriate to Vanessa's cognitive abilities.

¶ 58 In particular, Vanessa was never afforded a meaningful opportunity to practice parenting skills under appropriate supervision. At the outset of the case, the case manager and a psychologist both acknowledged the prospect of reunifying Emely and Vanessa was greater if there was supervision by a responsible adult. Likewise, Vanessa repeatedly stated her preference for a placement in which both she and Emely could live. ADES conceded such a placement was possible. *Nonetheless, ADES made no coordinated effort during the proceedings to locate a placement in which Vanessa had the opportunity to parent Emely under the supervision of a responsible adult.*[18] Instead, Vanessa was given weekly one-to-two hour supervised visits with Emely, a structure that maintained Vanessa in a constant state of grief.

¶ 59 Thus, a complete review of the record reflects there was not a significant period of time in which Vanessa received stable and qualitatively beneficial services. More egregious, some of the "services" provided were abusive and exploitive. Given this, coupled with Vanessa's increasing awareness that she would ultimately be deprived of her child, it is hardly surprising that Vanessa responded throughout the dependency and termination proceedings in angst, frustration, and despondence. Considering Vanessa's long history with CPS and DDD, ADES was well aware that Vanessa was vulnerable to her circumstances and required specialized supervision and intervention.[19] Nevertheless,

---

18. This appears to conflict with DDD's own regulations. A DDD service recipient's individual service and program plan should take into account promotion and preservation of the recipient's family structure and functioning. A.A.C. R6–6–601(B)(3).

19. The court can take judicial notice of the fact that CPS and DDD fall under the purview of ADES. It is perhaps this fact that makes Vanes-

sa's story most disturbing. After years of physical, emotional, and sexual abuse while in the custody of CPS, Vanessa conceived and gave birth in juvenile detention, where her supervisors were aware that she needed prompts for personal care. Despite this, and the fact that she was a DDD recipient, she was apparently left to her own devices after she gave birth and turned eighteen. After the rather predictable result of this arrangement occurred and CPS intervened,

the court-ordered services mandated in this case were implemented and evaluated by ADES in a manner that reveals little sensitivity to these needs. The result is that the services provided were at best, inappropriate, and at worst, self-defeating.[20]

¶ 60 As noted by Vanessa's counselor, Vanessa was completely in the control of others throughout the case. Thus, the success or failure of family reunification lay, for the most part, in the hands of ADES through DDD and CPS. By operating in a manner that provided almost no reasonable opportunity for success, ADES effectively determined on its own that there could be no successful outcome to this case.

¶ 61 ADES thereby inappropriately usurped a key judicial function in dependency and termination proceedings. ADES was under a court order to provide services for the purpose of achieving a case goal of reunification and had no authority on its own not to comply with that order. At no point in the proceedings did the court find by clear and convincing evidence that Vanessa's mental illness or deficiency rendered her incapable of benefiting from reunification services. ADES never requested such a finding.

Therefore, at no point in the proceedings was ADES relieved from making reasonable efforts to provide court-ordered reunification services to Vanessa and Emely. *See* A.R.S. § 8–846(B)(1)(b) (reunification services not required if court finds by clear and convincing evidence that parent's mental illness or deficiency is of such magnitude that parent cannot benefit from services). *See also In re Daniel G.*, 25 Cal.App.4th 1205, 1216, 31 Cal.Rptr.2d 75 (1994) (if Department of Children's Services felt services should not have been provided, it should have brought the matter to court's attention at disposition hearing; otherwise it had a duty to make good faith effort to provide services).

¶ 62 Absent such finding, ADES could not satisfy its constitutional and statutory burden merely by stating at the time of severance that reunification services were futile. Rather, at that point, ADES had the burden of establishing that *further or additional appropriate* reunification services bore no reasonable prospect of success.[21] *Mary Ellen C.*, 193 Ariz. at 192, ¶ 34, 971 P.2d at 1053 (obligation on State to undertake reasonable, non-futile rehabilitative measures stems from principle that fundamental interest in parent-

---

Vanessa was placed in DDD custody, and the court ordered a plan involving both CPS and DDD. Despite that CPS and DDD are part of the same administrative agency, they were apparently unable to coordinate successfully so that Vanessa could have some chance at parenting Emely. Rather, they placed her in abusive, exploitive, and tormenting circumstances that worsened her situation. Then, ADES moved to terminate the familial relationship. Needless to say, the State should not be in the business of creating familial relationships that are "poore, nasty, brutish, and short." Thomas Hobbes, *Leviathan* 89 (Revised Student Ed., Cambridge Univ. Press 1996). *See also* Moore, Sir Thomas, *Utopia* 22 (Paul Turner, trans., Penguin Books 2003) ("In this respect you English, like most other nations, remind me of incompetent schoolmasters, who prefer caning their pupils to teaching them. Instead of inflicting these horrible punishments, it would be far more to the point to provide everyone with some means of livelihood, so that nobody's under the frightful necessity of becoming first a thief and then a corpse.")

20. This cannot pass constitutional or statutory muster. The services, and their implementation, must have a reasonable prospect of successfully reunifying the family. *Mary Ellen C.*, 193 Ariz. at 192, ¶ 34, 971 P.2d at 1053. If the services,

and the means in which they are provided, are not appropriate in light of a parent's disabilities, they do not bear a reasonable prospect of successfully reunifying the family and therefore they do not satisfy the State's obligations. *See In re Christopher B.*, 823 A.2d 301, 308 (R.I.2003) (what constitutes reasonable reunification efforts may vary according to capacity of parents); *Matter of L. Children*, 131 Misc.2d 81, 499 N.Y.S.2d 587, 592 (Fam.Ct.1986) (failure to provide specialized services to parent diagnosed as mildly mentally retarded constitutes failure to make diligent reunification efforts).

21. For this reason I respectfully disagree with *Mary Lou C. v. Arizona Department of Economic Security* insofar as it indicates that a failure to provide reasonable reunification services may be overlooked if there is evidence in the record that services might have been futile had they been provided. *See* 207 Ariz. 43, 50, ¶ 18, 83 P.3d 43, 50 (App.2004). The State's obligation to *make a reasonable effort* to preserve the family by *undertaking measures* with a reasonable prospect of success is emasculated by an approach that would excuse the State's failure to fulfill that duty if the State can call into doubt the potential effectiveness of the measures it failed to undertake with its own self-serving documents and witness testimony.

child relationship should not be terminated until concerted effort to preserve relationship fails) (citing *Arizona Dep't of Econ. Sec. v. Mahoney*, 24 Ariz.App. 534, 537, 540 P.2d 153, 156 (1975) ("Termination of the parent-child relationship should not be considered a panacea but should be resorted to *only when concerted effort to preserve the relationship fails*.") (emphasis supplied)). As it had not provided reasonable reunification services, it could not show that *further* or *additional* services were futile. Instead, ADES sought to shift the cost of its own poor performance upon Vanessa again by asking the courts to find that the constitutional, statutory, and court-ordered obligations it did not fulfill were nonetheless futile. Our judicial oversight has likewise failed by acquiescence.

## II. Immutable Mental Condition

¶ 63 ADES's failure to meet its burden notwithstanding, the record does not clearly reflect, as the majority concludes, that reasonable services would have in fact been futile. The majority relies heavily upon evidence presented that Vanessa's mental retardation was a condition that would never improve, and that services would never improve her mental condition. This mistakenly assumes the thrust of rehabilitative services required by *Mary Ellen C.* is to restore the parent's mental capacity.

¶ 64 The aim of rehabilitative services in the dependency and severance context should be to restore the parent's ability to care for the child. *See Mary Ellen C.*, 193 Ariz. at 191, ¶ 31, 971 P.2d at 1052 ("It is inherent in [section 8–533(B)(3) ] that the condition be proven not to be amenable to rehabilitative services that could restore a mentally ill parent's *ability to care for a child* within a reasonable time.") (Emphasis supplied). Neither courts nor CPS professionals should reflexively equate mental capacity with the ability to parent. *See* Hayman at 1216–1222.[22]

¶ 65 The record cited by the majority is problematic in that it clearly equates mental capacity with parenting ability. Each response related to parenting ability addresses Vanessa's mental capacity, and then immediately concludes that it would be unwise to return Emely to her care. There is no stated analytical connection between Vanessa's mental condition and her purported inability to parent. The reports of the CPS case manager and both psychologists are replete with similar logical leaps, and therefore indicate the same erroneous assumption.[23]

¶ 66 Contrary to the above assumptions, the aim of the services required in this case was not the admittedly futile endeavor of bringing Vanessa to a normal intellectual capacity. Rather, the aim was to furnish Vanessa with the ability to provide parental care for Emely. Nothing in the record indicates that such an aim is in fact futile. The court found, and the record supports, that Vanessa cannot conduct the functions of day-to-day living on her own, and by extension cannot independently provide for Emely's daily needs. At the same time, there is nothing

**22.** It is highly problematic to state that reunification efforts are futile when it is unlikely that the parent's mental condition will improve regardless of the actual ability to parent. Some mental conditions, like Vanessa's, are irremediable. Such a holding creates an entire class of parents to whom ADES need not provide *any* remedial services prior to moving for severance under section 8–533(B)(3). Given the fundamental nature of the parental right to a relationship with one's child, such disparate treatment of a class of persons may not withstand scrutiny under the Equal Privileges and Immunities Clause of the Arizona Constitution. *See Simat Corp. v. Arizona Health Care Cost Containment Sys.*, 203 Ariz. 454, 458, ¶ 15, 56 P.3d 28, 32 (2002).

**23.** This is not to state that an untreatable mental illness or defect should never support a finding

that rehabilitative efforts are futile. Certainly there may be some cases in which a parent's mental illness or deficiency in fact precludes the child's return to her care, and such mental illness cannot be treated or improved. Before reunification efforts may be judicially abandoned as futile, the linkage between the untreatable mental illness or deficiency and the ability to parent must be established in the record; it cannot be presumed.

Furthermore, as noted above, ADES does not have the authority on its own to determine that an immutable mental illness or deficiency renders its duty to undertake reasonable efforts to reunify the family futile. If ADES wishes to be relieved of its burden on those grounds, it should present its argument to the court for a finding relieving it of its duty.

in the record to support that she could not do so with support services.[24]

¶ 67 This brings us to another imbedded assumption underlying severance in this case with which I disagree. I do not agree that a parent must be able to care for her child independent of assistance, for her relationship with her child to withstand assault by the State under section 8–533(B)(3).

## III. Independent Care

¶ 68 The juvenile court's findings centered largely on the fact that Vanessa would never be able to function independently, and therefore she could not care for a child. A review of the psychological reports and the case manager's opinion further indicates an underlying assumption that, to return Emely to Vanessa's care, Vanessa must be able to function independent of assistance. Both rendered reports in which they supported an assertion that Emely could not be returned to Vanessa's care with references to Vanessa's inability to function without assistance.

¶ 69 To the contrary, section 8–533(B)(3) contains no requirement that a parent be able to discharge parental responsibilities independent of assistance. A.R.S. § 8–533(B)(3). To state otherwise, and hold that a parent may be deprived of the right to parent her child simply because she cannot do so without society's assistance, is a slippery slope to concluding once again that "[t]hree generations of imbeciles are enough." *Buck v. Bell*, 274 U.S. 200, 207, 47 S.Ct. 584, 71 L.Ed. 1000 (1927).

¶ 70 In fact, there is ample evidence in the record indicating that, given supervision and support services to assist and guide Vanessa, Vanessa's chances of successfully parenting Emely would improve. Notably, the parent aide reports indicate that, when prompted, Vanessa did perform parental functions. The court found, and the record supports, that Vanessa had attempted to comply with the services provided. Furthermore, Vanessa is under the supervision of DDD, and therefore is or should be in a position to receive assistance and supervision in the future. Assuming such assistance and supervision is adequate and non-abusive—as it ought to be—it is no great leap of the imagination that, with continued, appropriate, coordinated services, Vanessa could be safely and successfully reunited with Emely.

¶ 71 As a result, the record does not support that Vanessa would not participate in services tailored to providing her with the means necessary given her circumstances to care for Emely. This is certainly true given that Vanessa was not afforded the opportunity to parent Emely with supervision and support, as she repeatedly requested. *Cf. In re Pima County Severance Action No. S–2397*, 161 Ariz. 574, 579, 780 P.2d 407, 412 (App.1989) (provision of residential program for mother and child would be futile when mother rejected program until two weeks before hearing).

¶ 72 The record therefore does not support that ADES provided adequate reunification services before Vanessa's parent-child relationship was terminated. The record further does not support that any such services would have been futile. Thus, the court's order terminating the parent-child relationship between Vanessa and Emely was clearly erroneous.

## CONCLUSION

¶ 73 I recognize that ADES is burdened with a high volume of cases and relatively few resources. At the same time, insofar as the work ADES performs determines whether a family remains a unit or is torn asunder, the rights and interests ADES holds in its hands are deeply personal and profound. For this reason, the law requires that ADES provide reunification services diligently and

---

24. In support of its argument that services would be futile, ADES argues Vanessa did not improve in her parenting skills after more than six months of parent aide sessions. The record does not support this contention: Vanessa was retaining knowledge such as Emely's clothing size, where to locate baby food and clothing at the store, and how to avoid choke hazards. Furthermore, given that the record indicates the parent aide services provided were not appropriate to Vanessa's developmental disabilities, there is nothing in the record to support that Vanessa would not benefit from parent aide services appropriate to her needs. *See Mary Ellen C.,* 193 Ariz. at 191, ¶ 31, 971 P.2d at 1052.

in a manner that bears a reasonable prospect of success given the individual needs of the parent and the child. The manner in which Vanessa received services in this case is not commensurate with this duty. Given this, there is nothing to support the conclusion that she would not benefit from appropriate services. A grave injustice is worked in this case. For these reasons, I respectfully dissent.