NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

AMBER S., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, L.C., *Appellees*.

No. 1 CA-JV 17-0113
FILED 9-14-2017

Appeal from the Superior Court in Maricopa County
No. JD528591
The Honorable Timothy J. Ryan, Judge

**AFFIRMED**

COUNSEL

The Stavris Law Firm, PLLC
By Alison Stavris
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Ashlee N. Hoffmann
*Counsel for Appellee Department of Child Safety*

---

## MEMORANDUM DECISION

Presiding Judge James P. Beene delivered the decision of the Court, in which Judge Randall M. Howe and Judge Kent E. Cattani joined.

---

**B E E N E**, Judge:

**¶1**        Amber S. ("Mother") appeals the superior court's order terminating her parental rights to her daughter.  For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

**¶2**        Mother and Nicolas C. ("Father")[1] are the biological parents of L.C. (born in March 2015).  When L.C. was less than one-week old, the Department of Child Safety ("DCS") took her into temporary physical custody and filed a dependency petition.  DCS alleged that Mother was unable to parent L.C. due to (1) neglect because Mother and Father were homeless and could not provide for L.C.'s basic needs and (2) Mother's mental health because she had a serious mental-illness and was not taking her medication.

**¶3**        Mother denied the allegations, but submitted the issue of dependency to the superior court.  The court found L.C. dependent and adopted a case plan of family reunification.  DCS offered Mother the following services to reunify with L.C.:  parent aide; case aide; supervised visits; psychological evaluation; transportation; and coordination with Mother's mental health provider through Partners in Recovery.

**¶4**        Mother participated in services, including a psychological evaluation in September 2015 with Dr. Jessica Leclerc.  Mother was diagnosed with bipolar disorder and personality disorder with borderline and histrionic traits.  Dr. Leclerc found that if Mother "can actively engage in services, show a pattern of stability . . . maintain a health[y] interpersonal support system, she should be able to exhibit minimally adequate parenting skills within the foreseeable future."

---

[1]     The superior court also terminated Father's parental rights in 2016; however, he is not a party to this appeal.

**¶5** Despite Mother's participation in services and Dr. Leclerc's instructions, Mother and Father engaged in domestic violence throughout the dependency proceedings. In November 2015, DCS updated Mother's case plan to reflect her domestic violence and co-dependency issues. Mother admitted that she and Father had engaged in domestic violence from at least 2014 — they both were arrested during one instance in 2014, Father had assaulted her in 2014-2015 (presumably while Mother was pregnant with L.C.), Father was arrested in 2015 when he hit someone else in an attempt to hit Mother, and Father assaulted someone in Mother's apartment complex in 2016.

**¶6** Given the domestic violence concerns, the superior court changed Mother's case plan in August 2016 to severance and adoption. The next month, DCS filed a petition to terminate Mother's parental rights on the grounds of fifteen months' out-of-home placement under Arizona Revised Statutes ("A.R.S.") section 8-533(B)(8)(c). DCS alleged that Mother had failed to demonstrate that she made behavioral changes necessary to ensure the safe return of L.C. because she was deceptive about her continued contact with Father and lacked an understanding of the safety concerns Father presented.

**¶7** A contested termination hearing was held in February 2017. The superior court terminated Mother's parental rights and found that severance was in L.C.'s best interests. Mother timely appealed the termination. We have jurisdiction pursuant to A.R.S. §§ 8-235(A) and 12-120.21(A)(1) (2017). [2]

## DISCUSSION

**¶8** The fundamental right to parent one's child is not absolute. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 24 (2005). The superior court may terminate parental rights if it finds, "by clear and convincing evidence, at least one of the statutory grounds set out in section 8–533,"and by a preponderance of the evidence that termination is in the best interests of the child. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248–49, ¶ 12 (2000). The court must consider those circumstances existing at the time of the termination hearing. *Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 50, ¶ 12 (App. 2016). As the trier of fact, the superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*,

---

[2] Absent material revision after the relevant date, we cite a statute's current version.

209 Ariz. 332, 334, ¶ 4 (App. 2004). Thus, we review an order terminating parental rights for an abuse of discretion and will not reverse unless "there is no reasonable evidence to support" the order. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004).

## I. Sufficient Evidence Supports Severance

**¶9** Mother argues insufficient evidence supports the superior court's order severing her parental rights because she was consistent with her mental health services, obtained an order of protection against Father, successfully completed individual counseling, appropriately interacted with L.C. during visits, and obtained housing.

**¶10** To meet its burden under A.R.S. § 8-533(B)(8)(c), DCS was required to prove: (1) the child has been in an out-of-home placement for at least fifteen months; (2) DCS has "made a diligent effort to provide appropriate reunification services;" (3) "the parent has been unable to remedy the circumstances" causing the out-of-home placement; and (4) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future."[3]

## A. Diligent Effort to Provide Appropriate Reunification Services

**¶11** Mother argues DCS did not take the necessary steps to ensure she was provided with individual counseling services during a six-month lapse from May 2016 through November 2016.

**¶12** DCS must provide a parent "with the time and opportunity to participate in programs designed to help her become an effective parent[.]" *Maricopa Cty. Juvenile Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994). DCS must "undertake measures with a reasonable prospect of success," *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999), but it "is clearly not obligated to provide services which are futile," *Pima Cty. Severance Action No. S-2397*, 161 Ariz. 574, 577 (App. 1989) (citation omitted).

**¶13** At the termination hearing, DCS case manager Kimberly Tuttle testified that Mother was receiving counseling through Partners in Recovery, but her therapist left and was no longer providing services,

---

[3] Mother does not challenge the superior court's finding that L.C. had been in an out-of-home placement for at least fifteen months. Thus, we do not address it.

causing a gap in Mother's therapy. Mother was receiving social security disability insurance ("SSI") for mental health issues and, as such, DCS was not permitted to offer or refer Mother for counseling services. Further, DCS was required to comply with the terms of SSI by coordinating with Mother's behavioral case manager at Partners in Recovery, Sarah Hilger. Tuttle explained that she told Mother that if Partners in Recovery was not providing her with therapy, Mother would have to find another organization through SSI.

¶14 Sarah Hilger confirmed Tuttle's account of the lapse in Mother's counseling. Hilger explained that Mother's therapist left Partners in Recovery and that she made several referrals for replacement counseling services, but each "continued to come back as declined at capacity." Then, it took time to find a counselor to meet Mother at her home, as Hilger requested, to facilitate an easier process for Mother. Mother began therapy again in August 2016.

¶15 Over nearly two years, Mother was provided with a parent aide, case aide, supervised visits, psychological evaluation, transportation, and coordination with Partners in Recovery. The lapse in her counseling was four months (May 2016 through August 2016). DCS made a diligent effort to provide Mother with appropriate reunification services. And given Mother's SSI benefits and the resulting limitation placed on DCS, we agree with the superior court's finding that DCS "acted reasonably in relying on the service providers providing care and services for Mother through her SSI disability status."

## B. Unable to Remedy Circumstances Causing Out-of-Home Placement

¶16 The superior court found that Mother was unable to remedy the circumstances causing L.C. to be in out-of-home placement due to her long-standing domestic violence issue with Father. Based on this record, we agree.

¶17 Early in the dependency proceedings, Mother and Father were referred for parent-aide services. At the intake session in June 2015, Father "was asked to leave the building due to his aggressive actions and belittling" of Mother. Mother told her case manager that "she worries about [Father] being around because he has paranoia and aggression . . . he has had assault charges and she does not want to go back with him." However, Mother returned to Father upon his release from jail, telling her case manager she "did not mean any of those things." In July 2015, another

domestic violence incident occurred between Mother and Father. And the next month, the parent aide expressed concerns about the "continued domestic violence encounters between [Mother and Father]," noting that Mother was very defensive of him and stated she had "no intent on not having a relationship with [Father] despite the domestic violence within the relationship." Then in September 2015, Father was arrested for assault when he "hit [Mother's] behavioral health case manager in the midst of trying to hit [Mother]."

¶18        Police reports in 2016 further substantiated the continuing violence and instability in Mother's relationship with Father. In February 2016, Mother called police claiming she and Father got into an argument and he kicked the wall. Apparently, Father had been staying at Mother's apartment, but told police he was leaving and did not intend to return. On May 17, 2016, the landlord called police to Mother's apartment complex because Mother and the landlord had a verbal altercation. Witnesses told police Mother was yelling and cursing and told the landlord "karma is a bitch." Less than one week later, on May 23, 2016, police were again called to Mother's apartment complex. In response to Mother's prompting, Father came to her apartment carrying a crow bar and threatening bodily harm to people with whom Mother had arguments. Father was arrested.

¶19        Tuttle testified that Mother completed her parent-aide referral, but not successfully due to her continuing contact with Father and refusing to acknowledge issues of domestic violence between her and Father. DCS was still concerned about this at the time of the termination hearing. Tuttle explained that Mother had been instructed by DCS numerous times it was not in L.C.'s, or her own, best interests to be in contact with Father due to his volatile temper. In fact, at an in-person meeting with Tuttle and the parent aide, Mother played audio recordings of incidents of domestic violence where Mother begged Father not to hit her. Despite this abuse, Mother continued to have a relationship with him. Tuttle confirmed the May 23, 2016 incident where Father was arrested at Mother's apartment. She stated that Mother and Father had a court hearing on May 24. Father did not appear at the hearing. When questioned, Mother told the court she did not know Father's whereabouts and had not had contact with him.

¶20        Tuttle testified that up until the May 2016 incident, the case plan was family reunification because DCS felt Mother had participated in services and had ended her relationship with Father. But, had DCS known Mother was still involved with Father, it would not have requested a family reunification case plan. Tuttle stated that Father continuously threatened

and harassed her and other parties involved in the dependency, including the CASA, and L.C.'s foster placement, and made blanket statements that everyone involved would be harmed because they kidnapped his child. Tuttle explained that despite Father's parental rights being severed months ago, he was still threatening everyone involved and it would be unsafe to return L.C. to Mother. Tuttle admitted Mother had recently taken steps to conceal her residence from Father, including obtaining an order of protection against him. However, Mother failed to provide DCS with proof she served, or even attempted to serve, the protective order on Father. Tuttle acknowledged that Mother has limited funds, perhaps creating a barrier to serving the order of protection on Father. But because Father's address remained the same throughout the dependency proceedings and was the same address listed in his criminal assault case, Mother would have known where to serve him.

¶21 Mother admitted that she had lied to the court, DCS, and everyone involved when she stated at the May 24 hearing that she was not involved in a relationship with Father and did not know his whereabouts. Mother also admitted that before DCS received the May 2016 police report and confronted her, she was having unsupervised visits with L.C. at her home, but denied that Father was at her home during those visits. Mother said she continued her relationship with Father because she felt they could co-parent, that he would change. But after the May 2016 incident, Mother said she became afraid of Father, surrounded herself with positive people and her family, participated in therapy, took classes, obtained an apartment, and began taking care of her depression and anxiety. As such, Mother said she was a different person and wanted a chance to parent L.C. because she had worked so hard.

¶22 In its severance order, the superior court detailed the domestic violence history between Mother and Father, including Mother's attendance at hearings where the court admonished Father for his threatening behaviors. Yet she continued to allow Father to live with her and lied to the court about it. The court found:

> Mother continues to lack credibility . . .
>
> * * * *
>
> . . . even though she claims that she had been untruthful in the past, but was being truthful at trial. It is more reasonable to believe Mother's continued statements throughout the case, that she still wants to parent with [Father], and acts in a

> manner consistent with her statements that she intends to continue to be romantically involved with him.
>
> * * * *
>
> Mother's claimed inability to serve the municipal court order of protection also lacks credibility, as domestic violence programs routinely provide waiver or deferment of costs of service, and Father's residence at [xyz] street remains the same.

**¶23** We conclude that the superior court did not abuse its discretion in finding Mother had not remedied the domestic violence circumstances that caused L.C. to be in out-of-home placement.

### C. Substantial Likelihood Mother Will Not be Capable of Exercising Proper and Effective Parental Care and Control in Near Future

**¶24** Mother argues because she remedied the circumstances causing L.C. to be in out-of-home placement, there is a substantial likelihood she will be capable of exercising proper and effective care and control in the near future. The superior court found, however, that Mother was unable to rid herself of the violent and abusive relationship with Father. We agree. Substantial evidence in the record supports the finding that Mother will not capable of exercising proper and effective parental control in the near future.

## II. Severance is in L.C.'s Best Interests

**¶25** Mother argues that severance is not in L.C.'s best interests and the court should give her a chance to be reunified with L.C. because she has changed her life.

**¶26** To prove that severance is in the child's best interests, DCS must show that the child would either benefit from severance or be harmed by a continuation of the parental relationship. *Mario G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 282, 288, ¶ 26 (App. 2011). We will uphold the superior court's best interests determination if a preponderance of the evidence supports it. *Kent K.*, 210 Ariz. at 284, ¶ 22. It is sufficient that DCS show severance would free a child for adoption, and that the child would benefit from finding an adoptive placement. *See JS-501904*, 180 Ariz. at 352. Additionally, DCS can establish that termination is in a child's best interests

by presenting evidence showing that an existing placement is meeting the needs of the child. *Mary Lou C.*, 207 Ariz. at 50, ¶ 19.

**¶27**      The superior court's finding that severance was in L.C.'s best interests is supported by a preponderance of the evidence. Tuttle testified that for over one year L.C. has been in a foster home that is an adoptive placement. Tuttle said L.C.'s foster home was providing a safe and stable home for her and caring for all her needs. Further, Tuttle testified L.C. has a significant bond with her foster parents and brother. At the time of the termination hearing, L.C. had been in placement for nearly her entire life. We agree with the superior court: L.C. "should not languish in the system and have permanency delayed."

## CONCLUSION

**¶28**      Because sufficient evidence supports the superior court's termination of Mother's parental rights, we affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA