NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ADRIENNE D., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, T.D., K.D., A.D., *Appellees*.

No. 1 CA-JV 21-0314
FILED 6-14-2022

Appeal from the Superior Court in Maricopa County
No. JD32093
The Honorable David O. Cunanan, Judge

**AFFIRMED**

COUNSEL

John L. Popilek PC, Scottsdale
By John L. Popilek
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By James William Rappaport
*Counsel for Appellees*

---

**MEMORANDUM DECISION**

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Maria Elena Cruz and Judge Samuel A. Thumma joined.

---

**B R O W N**, Judge:

¶1　　　　Adrienne D. ("Mother") appeals the juvenile court's order terminating her parental rights to her children T.D., born in 2013, K.D., born in 2016, and A.D., born in 2017. Because reasonable evidence supports the court's order, we affirm.

## BACKGROUND

¶2　　　　In 2016, the Department of Child Safety ("DCS") received a report that both Mother and K.D. tested positive for marijuana when K.D. was born. Upon further investigation, DCS discovered that Mother also lacked stable housing and that she hit then two-year-old T.D. with a paddle as a form of discipline. DCS removed T.D. and K.D. from the home and filed a dependency petition. After Mother completed services, the court returned the children to her care and dismissed the dependency.

¶3　　　　Mother gave birth to A.D. in 2017. Three years later, DCS investigated a new report that Mother had abused K.D. The investigator visited Mother's home twice, but Mother would not allow the investigator to see K.D. DCS returned to the home with police and observed four-year-old K.D. with bruising around her eyes, a burn on the right side of her face, significant swelling to her head, and lacerations on her legs. Police interviewed Mother, who told them she caused K.D.'s leg injuries by beating her with a switch. Mother also admitted to hitting the children with a belt. When asked about the burn, Mother explained that she accidentally burned K.D. with hot water when styling K.D.'s hair, and that the injury worsened due to a sunburn on the same area. Mother denied causing K.D.'s black eye, explaining that "[a]ll of her kids fall and hurt themselves."

¶4　　　　Doctors treated K.D. at a hospital and received information that Mother regularly "whoops" all the children with a belt but that K.D. was hit the most. The hospital staff also learned that K.D.'s head was swollen because K.D. "kept crying . . . so [Mother] kept hitting her." Subsequent reports from similar sources indicated that Mother "whoops"

2

K.D. "all the time" and beats K.D. and T.D. with her hand, a belt, and a switch.

¶5 Meanwhile, police interviewed individuals acquainted with Mother. A neighbor reported that Mother "took her whole hand and smacked" K.D.'s face "with all of her power, e[v]ery bit of strength she had," and on other occasions, threatened to light K.D. on fire with lighter fluid and throw her out of a car. Mother also threatened to "slice [the children's] throats." Another acquaintance had seen K.D. with burns and bruising "on her chest all the way up to her face" and bruising and swelling on both her eyes. She saw Mother threaten to "rough [K.D.] up" and force the child to sit in a corner from "morning until night" with no restroom breaks. This acquaintance also reported that Mother did not refer to K.D. by name, but instead called her demeaning names, such as "the reject" and "short bus." On one occasion, Mother stated "If I wanna beat my kids to death I can. They're mine."

¶6 Police also reviewed text messages Mother had sent from her phone, including a message that stated, "I ain't the only person in the world that beat the[ir] kids ass." Mother admitted "that she has a problem and acts extreme" and that she "has beat [K.D.] and left welps" on her butt, legs, and arms. She further acknowledged that she "might back hand her upside the head" and that she "hurt[s] her sometimes." DCS took custody of the children and petitioned for a dependency.

¶7 After Mother pled no contest to the petition, the juvenile court adjudicated the children dependent and adopted a case plan of family reunification concurrent with severance and adoption. DCS provided Mother with referrals for a psychological evaluation and a parent aide with visitation. Mother's evaluating psychologist gave a very guarded prognosis of her future ability to parent the children. The psychologist recommended that Mother engage in therapy with a doctorate-level therapist and successfully complete the parent-aide service. Mother, however, did not complete the parent-aide service successfully because she did not meet the parenting goals of being resilient, tolerant, or supportive of the children, or the goal of expressing love and empathy for the children. And although DCS tried to refer Mother for individual counseling, she declined it. Nonetheless, she completed some parenting classes.

¶8 Given Mother's lack of progress, DCS moved to terminate Mother's parental rights based on abuse. A.R.S. § 8-533(B)(2). After a two-day hearing, the juvenile court granted the motion. Mother timely appealed, and we have jurisdiction pursuant to A.R.S. § 8-235(A).

**DISCUSSION**

**¶9** To terminate parental rights, a court must find (1) by clear and convincing evidence that at least one statutory ground in A.R.S. § 8-533 has been proven, and (2) by a preponderance of the evidence that termination is in the child's best interests. *Jennifer S. v. Dep't of Child Safety,* 240 Ariz. 282, 286, ¶ 15 (App. 2016). We view the facts in the light most favorable to sustaining the court's order, *Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 449, ¶ 12 (App. 2007), and we will affirm so long as reasonable evidence supports the order, *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009). "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.,* 203 Ariz. 278, 280, ¶ 4 (App. 2002).

**¶10** To sustain its burden here, DCS was required to prove that Mother "wilfully abused" K.D., *see* § 8-533(B), and there was a risk of harm to T.D. and A.D. if they remained in Mother's care. *Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224, 229, ¶ 24 (2020) ("[A] juvenile court may terminate a parent's rights to non-abused children under § 8-533(B)(2) only if the extrapolation of unfitness—the risk of harm to such children—is proven by clear and convincing evidence."). Abuse means "the infliction or allowing of physical injury." A.R.S. § 8-201(2).

**¶11** Mother first contends that DCS failed to prove she abused K.D. by clear and convincing evidence because the evidence presented "was almost entirely circumstantial" with "innocent and non-abusive explanations." But "[t]he probative value of evidence is not reduced simply because it is circumstantial." *State v. Blevins*, 128 Ariz. 64, 67 (App. 1981). Moreover, "resolution of . . . conflicts in the evidence is uniquely the province of the juvenile court as the trier of fact; we do not re-weigh the evidence on review." *Jesus M.*, 203 Ariz. at 282, ¶ 12.

**¶12** Reasonable evidence supports the juvenile court's finding that Mother willfully abused K.D. Police officers, DCS, and hospital staff observed K.D.'s extensive physical injuries. Mother admitted she caused the marks on K.D.'s legs by repeatedly beating her with a switch. Other reports confirmed that Mother regularly abuses K.D., and that Mother caused K.D.'s bruising and head swelling by repeatedly hitting her. These disclosures are also consistent with Mother's own admissions and observations made by her acquaintances.

¶13 Next, Mother argues DCS presented no evidence that T.D. and A.D. were at a risk of harm in her care. On the contrary, the evidence shows that Mother's abuse and threats had been ongoing and were not just directed at K.D. Mother admitted in her first dependency that she would hit T.D. with a paddle as a form of discipline. In the current dependency, hospital staff learned that Mother "whoops" T.D. and A.D. with a belt. And a forensic interview revealed that Mother "whoop[s]" T.D. with her hand, a belt, and a switch. Moreover, Mother threatened to kill or beat all of the children, not just K.D. Additionally, acquaintances reported that Mother isolates the children by "never let[ting] them out of the house" and that she tells the children they will be taken away and hurt if they divulge the abuse. Mother's abuse of K.D. itself also placed seven-year-old T.D. and three-year-old A.D. at a risk of harm in her care. At their young ages, they were still very dependent on their caregiver to meet their needs and protect them, making them vulnerable to Mother's threats and abuse. Reasonable evidence supports a finding that T.D. and A.D. were at a risk of harm in Mother's care.

¶14 Finally, Mother asserts that DCS failed to provide diligent reunification services. Specifically, she contends that DCS should have provided another parent-aide referral. However, Mother has not shown where in the record she requested a second parent aide or objected to the juvenile court's finding that DCS was providing adequate services. Thus, she has waived this issue on appeal. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 178, ¶ 16 (App. 2014) (parents must voice their concerns about services to the juvenile court in a timely manner); *In re Kyle M.*, 200 Ariz. 447, 448, ¶ 2 (App. 2001) (even constitutional arguments can be waived if not presented to the juvenile court). Regardless, reunification services are not statutorily required when terminating parental rights for abuse, *see* § 8-533(B)(2), and no Arizona court has held that DCS is constitutionally required to do so. Nonetheless, assuming the issue has not been waived, and that DCS was required to provide reunification services to Mother, we find DCS made reasonable efforts.

¶15 Mother contends that DCS "abruptly terminate[d] the [parent-aide] service," and should have provided another parent-aide referral. But DCS is only required to "undertake measures with a reasonable prospect of success." *Jordan C.*, 223 Ariz. at 94, ¶ 20. Although Mother takes issue with being assigned a new parent aide a few weeks before the service ended, she concedes to receiving the full six-month program. And she was closed out unsuccessfully because she failed to improve caregiving capacities pertaining to the children's physical and emotional wellbeing. The parent aide reported to DCS that these capacities

"would be better addressed in an individual counseling setting, versus a parent[-]aide setting," and Mother's evaluating psychologist likewise opined that until the reasons underlying Mother's abuse of K.D. are "explored in therapy and understood, it is likely these conditions will continue for a prolonged period of time and result in a poor parent-child relationship." DCS offered Mother individual counseling on a few occasions, but she refused it. Thus, we cannot say that DCS's decision to offer individual counseling instead of a second parent aide was unreasonable. *See Pima Cnty. Severance Action No. S-2397*, 161 Ariz. 574, 577 (App. 1989) (DCS is not required to provide duplicative services); *Mary Ellen C. v. Dep't of Econ. Sec.*, 193 Ariz. 185, 186-87, ¶ 1 (App. 1999) (DCS is not required to provide futile services).

**CONCLUSION**

¶16      For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA

6