NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

MEAGEN G., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, A.G., M.G., *Appellees.*

No. 1 CA-JV 22-0058
FILED 9-22-2022

Appeal from the Superior Court in Maricopa County
Nos. JD527571
JS520001
The Honorable Cassie Bray Woo, Judge

**AFFIRMED**

COUNSEL

Denise L. Carroll Esq., Scottsdale
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Autumn Spritzer
*Counsel for Appellee, Department of Child Safety*

## MEMORANDUM DECISION

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Brian Y. Furuya and Judge Paul J. McMurdie joined.

C A M P B E L L, Judge:

¶1 Meagen G. appeals from the termination of her parental rights to her two children on the grounds of fifteen-months' out-of-home placement.[1] *See* A.R.S. § 8-533(B)(8)(c). She also challenges the juvenile court's statutory and best interests findings. Because the record supports the court's findings, we affirm.

## BACKGROUND[2]

¶2 Meagen G. (Mother) is the biological mother of Luanne and Zoe, who were born in 2007 and 2011, respectively.[3] About three years after Zoe's birth, the Department of Child Safety (DCS) took the two girls into custody because of their father's (Father) incarceration and Mother's mental and physical health issues, substance abuse, and neglect. The juvenile court later found the girls dependent regarding Mother. *See Meagen G. v. Dep't of Child Safety*, 1 CA-JV 14-0262, 2015 WL 680752, at *1, ¶ 1 (Ariz. App. Feb. 17, 2015) (mem. decision) (affirming dependency). After Father's release the next year, the court placed the girls in his care and dismissed the dependency. In 2018, Father was imprisoned again for forgery. The girls continued living with their stepmother until she became ill, after which the girls went to live with relatives in Kansas.

¶3 In 2019, the girls' guardian ad litem petitioned the court for a finding of dependency regarding Mother because of her continuing mental health issues, substance abuse, and neglect, which the juvenile court later

---

[1] The juvenile court also terminated the children's father's parental rights, but he is not a party to this appeal.

[2] We view the evidence in the light most favorable to upholding the juvenile court's termination ruling. *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010).

[3] We use pseudonyms to protect the minors' identities.

granted. In June 2021, DCS petitioned to terminate Mother's parental rights because of the girls' out-of-home placement, citing Mother's failure to participate in services and her ongoing mental health and substance abuse issues.

¶4        During the second dependency and termination proceedings, DCS provided the family with several reunification services, referring Mother for drug testing and treatment, and facilitated visitation services. Mother missed nearly all her DCS-referred drug tests, submitting just five samples. Four of the samples were positive for methamphetamines or amphetamines or both, including her last test in March 2021; the fifth sample was too diluted to test. Mother also failed to follow through with six referrals for drug-treatment services. Mother self-referred to several inpatient behavioral-health programs between 2019 and 2021. During treatment, Mother disclosed that she struggled with alcohol and drug addiction, suicidal ideation, and a brain injury. She also informed her provider that she had been arrested "about 50 times," including twice for DUI, and that she had been hospitalized for mental health and substance abuse more than ten times.

¶5        After their removal in 2014, Mother had no regular visitation with the girls—partly because the juvenile court ordered that visitation be at the girls' discretion, and the girls were adamant about not wanting to interact with her. The girls visited Mother once in 2019, reporting Mother slept for most of the visit, and there was little food in her house. Luanne told DCS that when the girls lived with Mother, she often did not feed them or have food in the house, she drank alcohol and used drugs, and she "like[d] to get crazy" and threw "fit[s]." Luanne also said Mother "would hit [the girls] whenever she could on their bod[ies]," "ha[d] thrown . . . dolls at Zoe," and "ha[d] thrown plates at her head," causing bruises. The girls said they were "terrified" of Mother and no longer viewed her as their parent. Mother did send the girls letters, cards, and gifts. In addition, she and the older girl, Luanne, communicated by text—without DCS's knowledge or permission—in the months before the severance hearing.

¶6        The juvenile court held a two-day severance hearing in February 2022. At that time, Mother had been in inpatient treatment for about four-and-a-half months for mental health and substance-abuse disorders. While in treatment, Mother maintained her sobriety and participated in mental health appointments. She had also been employed full-time for about a month and was eligible for discharge to a sober living facility within a week or two. After the hearing, the juvenile court terminated Mother's parental rights under A.R.S. § 8-533(B)(8)(c) on the

grounds of fifteen-months' out-of-home placement. Mother timely appealed.

## DISCUSSION

**¶7**         Mother challenges the juvenile court's findings on the statutory ground for termination and the girls' best interests. To terminate parental rights, the "court must find, by clear and convincing evidence, at least one of the statutory grounds set out in [A.R.S. §] 8-533, and also that termination is in the best interest[s] of the child." *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 579, ¶ 8 (2021) (quotation omitted). "We review the court's termination decision for an abuse of discretion and will affirm unless no reasonable evidence supports the court's findings." *Id.* at ¶ 10. We review de novo, however, the interpretation and application of A.R.S. § 8-533. *Id.* at 580, ¶ 10.

## I.     Statutory Grounds

**¶8**         To terminate a parent's rights under A.R.S. § 8-533(B)(8)(c), DCS must prove, as relevant here, that it "has made a diligent effort to provide appropriate reunification services" and "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." Mother challenges the sufficiency of the evidence for both elements.

### A.     Reunification Services

**¶9**         Mother first challenges the juvenile court's finding that DCS made appropriate reunification efforts before severance. DCS has statutory and constitutional obligations to make reasonable and diligent efforts to reunify the family before termination. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 19 (App. 2009); A.R.S. § 8-533(B)(8). DCS need not "provide every conceivable service" or "undertake rehabilitative measures that are futile" or duplicative. *Id.* at 94, ¶ 20 (quotation omitted); *Pima Cnty. Severance Action No. S-2397*, 161 Ariz. 574, 577 (App. 1989). Instead, it must only "provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child" and "undertake measures with a reasonable prospect of success." *Jordan C.*, 223 Ariz. at 94, ¶ 20 (quotation omitted).

**¶10**         Here, the juvenile court found DCS had met its obligation by offering Mother drug testing and treatment, facilitated visitation services, and case management. Mother challenges the lack of visitation, contending reunification "could [n]ever be achieved without it" and faulting DCS for

failing to permit at least therapeutic visitation or family counseling. But as Mother admitted, the girls were upset to see Mother because of her behavior, and Mother did not become sober until late 2021. Any form of live interaction—even therapeutic visitation or family counseling—would have been futile until Mother was sober and mentally healthy, and the girls were ready to see her. The girls received counseling services throughout the proceedings, and DCS discussed visitation with them monthly, but the girls said "absolutely no" to visitation and were "not ready" for even telephone communication. Mother did not contest DCS's motion to suspend visitation in July 2020. *See Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251, ¶ 25 (2000) ("The burden to act as a parent rests with the parent, who should assert h[er] legal rights at the first and every opportunity.")

**¶11** Mother also faults DCS for not providing behavioral health services or a psychological evaluation. Mother self-referred for behavioral treatment throughout the case, and DCS did not have to duplicate those services. As for the psychological evaluation, DCS required Mother to show 30 days of sobriety before they would dedicate the resources for this service. By the time Mother did so—about three months before the severance hearing—the psychological evaluation was not feasible because Mother remained in inpatient treatment. Mother had more than two years to establish sobriety after the second dependency proceeding began. The lack of a psychological evaluation is attributable to her failure to timely maintain sobriety, not a failure of DCS's reunification efforts. *See Maricopa Cnty. Juv. Action No. JS-4283*, 133 Ariz. 598, 601 (App. 1982) (explaining "[w]hile [child welfare agency] had the responsibility to make all reasonable efforts to preserve the family relationship, its responsibility was not without limits and at some point the mother was required to make a good faith effort to reunite the family" (citation omitted)).

**¶12** In sum, any lack of services was caused mainly by Mother's behavior and choices. The juvenile court did not err in concluding DCS had met its obligation to attempt to reunify the family.

### B. Likelihood of Effectively Parenting in Near Future

**¶13** Citing both her testimony and her clinician's, Mother argues "she had turned her life around," "was addressing both her mental health issues as well as her substance addiction matters," and was "working and looking for a stable home." She contends DCS offered nothing to refute that evidence or to show she would be unable to parent in the near future. As the juvenile court explained, however, Mother's history, condition, and

relationship with the girls provided sufficient evidence she would be unable to parent effectively in the near future.

¶14 The juvenile court acknowledged Mother's four-months of sobriety and improved stability, but it found she had "only recently demonstrated any period of sobriety." Because of her history and continuing risk "of relapsing once outside of a structured environment," the court found Mother "would need to maintain sobriety and stability, outside of structured environment, for a significant period of time prior to the [girls] returning to her care." The court also found Mother would need to demonstrate stable employment, stable housing, and "repair her relationship with the [girls] before she could parent [them]." Because Mother had not yet done these things, the court found it substantially likely Mother would not be capable of properly parenting the girls in the near future. The record supports these findings.

¶15 Mother faults DCS for not presenting any evidence of "what would constitute a 'significant period of time.'" That issue is irrelevant, however, because Mother had not shown any recent period of sobriety, employment, or housing outside of a structured treatment environment. Mother had not proven she could function as a stable adult, much less parent two young children still struggling with the behavioral challenges that come from enduring traumatic events. Mother views the evidence of her rehabilitation differently than the juvenile court did, but we cannot reweigh the evidence. *See Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3, ¶ 9 (2016) (explaining "juvenile court is in the best position to weigh evidence and assess witness credibility"). Because the court's statutory findings support termination and are not clearly erroneous, Mother has not established grounds for reversal.

## II. Best Interests

¶16 Mother argues the juvenile court erred in finding termination was in the girls' best interests. Once the juvenile court finds termination is warranted, the court "can presume that the interests of the parent and child diverge." *Kent K. v. Bobby M.*, 210 Ariz. 279, 286, ¶ 35 (2005). At that point, the court must "focus[] primarily upon the interests of the child," *id.* at 287, ¶ 37, and the "child's interest in stability and security must be the court's primary concern," *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 12 (2018) (quotation omitted). Severance may be in the child's best interests if it would benefit the child or if denying severance would harm the child. *Id.* at ¶ 13. The court must consider the totality of the circumstances, including

the child's adoptability, current placement, and a prospective adoption. *Id.* at 150–51, ¶¶ 13–14.

¶17 Here, the juvenile court found the girls were adoptable and were currently living in a safe, stable, and nurturing placement with relatives who were willing to adopt them. The court found severance would benefit the girls by giving them a safe, stable, and permanent home. The court found that denying severance would harm the girls by prolonging the instability and uncertainty that had been ongoing for almost eight years and by subjecting them to a traumatic relationship with Mother. The court's findings are supported by the record.

¶18 The girls had been shuffled around every few years for almost all of their lives. Mother was not sober or mentally stable until a few months before the severance hearing and had not established sobriety or stability outside of a treatment setting. The girls had been traumatized by Mother and had no desire to see her. They wanted to be adopted and keep living and healing in Kansas with their relatives who had become their parental figures.

¶19 Mother argues that, without visitation, there was no way to determine whether the girls might benefit from having her in their lives. The record belies Mother's argument. By the time of severance, there was no remaining parental bond between the girls and Mother. As DCS's case manager testified, Mother was "a source of tremendous anxiety and sadness for [them]." Mother wanted more time to reunify, but she had almost eight years to turn her life around and reestablish a relationship with her children. We commend Mother for her current commitment to improving her life. But as this court explained in *Jennifer S. v. Department of Child Safety*,

> [g]enerally, a parent's temporary abstinence from drugs and alcohol does not outweigh [her] significant history of abuse or [her] consistent inability to abstain during [the] case. Moreover, children should not be forced to wait for their parent to grow up. Accordingly, a child's interest in permanency must prevail over a parent's uncertain battle with drugs.

240 Ariz. 282, 287, ¶ 17 (App. 2016) (quotation and citation omitted). "Leaving the window of opportunity for remediation open indefinitely [wa]s not necessary, nor do we think that it [wa]s in the [girls'] . . . best

interests." *Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994). In this case, the juvenile court did not err by closing the window.

## CONCLUSION

**¶20** For the reasons above, we affirm the termination of Mother's parental rights to Luanne and Zoe.



AMY M. WOOD • Clerk of the Court
FILED:   AA